IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| SAM KHOLI ENTERPRISES, INC. | § | |
|      Plaintiff | § | |
| | § | |
| v. | § | |
| | § | |
| TOM R. THOMPSON | § | Civil Action No. W-08-CA-105 |
| DBA | § | |
| THOMPSON TRUCKING, | § | |
|      Defendant, | § | |
| | § | |
| v. | § | |
| | § | |
| SAM KHOLI, | § | |
|      Third-Party Defendant. | § | |

### TOM R. THOMPSON D/B/A TOMPSON TRUCKING'S MOTION TO PERMIT JUDGMENT REGISTRATION AND APPLICATION FOR POST-JUDGMENT TURNOVER, RECEIVERSHIP AND INJUNCTIVE RELIEF

TO THE HONORABLE WALTER S. SMITH, JR., UNITED STATES DISTRICT JUDGE:

Pursuant to 28 U.S.C. § 1963 and Federal Rule of Civil Procedure 69, Tom Thompson

d/b/a Thompson Trucking ("Mr. Thompson") hereby moves this Court to allow registration of its

Amended Judgment of October 23, 2009 (the "Amended Judgment") in the United States District

Court for the Northern District of Texas and in the United States District Court for the Central

and Southern Districts of California. Mr. Thompson also makes application for post-judgment

turnover, receivership and injunctive relief, pursuant to Federal Rule of Civil Procedure 69 and

Texas Civil Practice and Remedies Code §31.002. In support of his Motion and Application,

Mr. Thompson would show:

    1.    This Court signed its Amended Judgment on October 23, 2009 [Document 99],

awarding Defendant/Counter-Plaintiff, Tom R. Thompson d/b/a Thompson Trucking a joint and

several judgment against Sam Kholi Enterprises, Inc. and Sam Kholi in the amount of

TOM R. THOMPSON D/B/A TOMPSON TRUCKING'S MOTION TO PERMIT
JUDGMENT REGISTRATION AND APPLICATION FOR POST-JUDGMENT TURNOVER RELIEF

033246/43351

1

$2,316,670.00, bearing post-judgment interest at the rate of .48% until satisfied, awarding

attorneys' fees in the amount of $30,569.08, and pre-judgment interest in the amount of

$132,189.00.

2.     Judgment-debtors Sam Kholi Enterprises, Inc., and Sam Kholi filed their joint

Notice of Appeal on November 4, 2009 as [Document 100].  Neither Judgment-Debtor Sam

Kholi Enterprises, Inc. nor Judgment-Debtor Sam Kholi has posted a supersedeas bond.

3.     28 U.S.C. §1963 provides, in pertinent part:

> A judgment in an action for the recovery of money or property entered in any
> court of appeals, district court, bankruptcy court, or in the Court of International
> Trade may be registered by filing a certified copy of the judgment in any other
> district or, with respect to the Court of International Trade, in any judicial district,
> when the judgment has become final by appeal or expiration of the time for
> appeal or when ordered by the court that entered the judgment for good cause
> shown.

"Good cause may be established under § 1963 by showing that the defendant lacks sufficient

property in the judgment forum to satisfy the judgment but has substantial assets in the

registration forum." *Fisher Scientific International, Inc. and Fisher Scientific Company, LLC v.*

*Modrovich and Hunnavix KFT.*, 2006 U.S. Dist. LEXIS 3419 (S.D. Tex. Jan. 17, 2006) (citing

*Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 2002

U.S. Dist. LEXIS 3980, No. Civ. A. H01-0634 (S.D. Tex. Feb. 20, 2002); *Dyll v. Adams*, 1998

U.S. Dist. LEXIS 1616 No. Civ. A. 3:91-CV-2734D (N.D. Tex. Feb. 6 1998).

4.     Good cause exists in this case to grant Mr. Thompson's motion to register the

Amended Judgment.  In support of this motion, attached hereto as Exhibit "A" is the affidavit of

Tom Thompson, who states (in summary) that Mr. Kholi revealed (during their pre-litigation

business negotiations) the existence of assets Mr. Kholi owns in California, including real estate,

bank accounts, and the ownership of business entities.  Mr. Thompson also believes that Mr.

TOM R. THOMPSON D/B/A TOMPSON TRUCKING'S MOTION TO PERMIT
JUDGMENT REGISTRATION AND APPLICATION FOR POST-JUDGMENT TURNOVER RELIEF

033246/43351

2

Kholi has stored some or many trailers at a truck stop Mr. Kholi owns or controls near Amarillo, Texas. The total value of the trailers is unknown, but Mr. Thompson believes it is far less than the amount of the Amended Judgment.

5.    Conversely, both judgment-debtors lack assets in this district or anywhere else in Texas, save for the trailers near Amarillo (if they are still located there). Mr. Thompson does not know of any assets Mr. Kholi claims to own in this District.

6.    Mr. Kholi has previously testified that Sam Kholi Enterprises, Inc. has significant assets in California. See excerpt of the Oral Deposition of Sam Kholi (taken on September 24, 2008) and attached hereto as Exhibit "B."

7.    Mr. Thompson also applies for post-judgment turnover relief. As the affidavit of Mr. Thompson reveals, Mr. Kholi claims to own a large payrolling company known as Payrolling.com. Mr. Thompson requests that Mr. Kholi turnover to the Sheriff of McLennan County, Texas all indica of ownership of Payrolling.com, Payrolling.com Corp. and Sam Kholi Enterprises, Inc., whether such indicia be original stock certificates, membership certificates, or any other indicia of ownership. Mr. Thompson requests that the Court order the Sheriff of McLennan County, Texas to conduct a sale of such indicia for Payrolling.com, Payrolling.com Corp. and Sam Kholi Enterprises, Inc., with the net sales proceeds paid to Mr. Thompson and credited to the judgment.

8.    Regarding Mr. Kholi's California real estate assets, Mr. Thompson would direct the Court's attention to the true and correct copies of e-mails and attachments Mr. Thompson exchanged with Jon Lacey, Mr. Kholi's California lawyer, attached to his affidavit as Exhibit "A-1" and previously admitted into evidence in the trial of this case as Exhibits D-39, D-42 and D-43.

TOM R. THOMPSON D/B/A TOMPSON TRUCKING'S MOTION TO PERMIT
JUDGMENT REGISTRATION AND APPLICATION FOR POST-JUDGMENT TURNOVER RELIEF

033246/43351                                                                                                              3

9.      Upon information and belief, at least one judgment-debtor, Sam Kholi, has begun transferring real estate assets located in the Southern District of California to his brother, Khouli Samer, and the Dehessy Corporation.  Attached as Exhibit "A-2" is a true and correct copy of a recent deed apparently executed by Mr. Kholi in September 2009, purportedly transferring the real property therein described Samer Khouli.  Because of those purposeful transfers, Mr. Thompson requests, pursuant to Fed. R. Civ. P. 65 and 69, and Tex. Civ. Prac. & Rem. Code § 31.002, et seq., and Chapter 65, that Mr. Kholi be enjoined from causing transfers of real estate, his ownership or control of business entities, or any personal property with a fair market value of $5,000.00 or more, either personally or through any business entity he owns or controls, until such time as the Amended Judgment herein is paid in full, or upon further Order of this Court. In support of his motion for injunctive relief, Mr. Thompson relies on his affidavit and all exhibits attached hereto.

10.     Pursuant to Fed. R. Civ. P. 69 and Tex. Civ. Prac. & Rem. Code § 31.002(3), Mr. Thompson requests the Court appoint a receiver with authority to take possession of the non-exempt property of Mr. Kholi and Sam Kholi Enterprises, Inc., sell all such property, and pay the proceeds to Mr. Thompson to the extent required to satisfy the Amended Judgment.

11.     Pursuant to Fed. R. Civ. P. 69 and Tex. Civ. Prac. & Rem. Code §31.002(e), Mr. Thompson requests he be awarded reasonable costs, including attorneys' fees.

## **PRAYER**

WHEREFORE, Mr. Thompson respectfully prays that the Court allow him to register the Amended Judgment of October 23, 2009 in the United States District Courts for the Northern District of Texas, the Central District of California, and the Southern District of California, that the Court grant Mr. Thompson's Application for Turnover and Injunctive Relief, that the Court

TOM R. THOMPSON D/B/A TOMPSON TRUCKING'S MOTION TO PERMIT
JUDGMENT REGISTRATION AND APPLICATION FOR POST-JUDGMENT TURNOVER RELIEF

033246/43351                                                                                                    4

order Sam Kholi to turnover any original documents constituting all indicia of his ownership of Payrolling.com, Payrolling.com Corp. and Sam Kholi Enterprises, Inc., to the Sheriff of McLennan County, Texas by January 25, 2010, that the Court order the sale of all indicia of ownership of Payrolling.com, Payrolling.com Corp. and Sam Kholi Enterprises, Inc., that the Court enjoin Mr. Kholi from causing transfers of real estate, his ownership or control of business entities, or any personal property with a fair market value of $5,000.00 or more, either personally or through any business entity he owns or controls, until such time as the Amended Judgment herein is paid in full, or upon further Order of this Court, for the appointment of a Receiver, and for his reasonable costs, including attorneys' fees.

Respectfully submitted,

    /s/ Jack R. Crews
JACK R. CREWS
State Bar Card No.: 05072300
BAIRD, CREWS, SCHILLER & WHITAKER, P.C.
15 North Main Street
Temple, TX  75601
Telephone:  (254) 774-8333
Fax:  (254) 774-9353

AND

MICHAEL G. COSBY
State Bar Card No.: 04847500
PAKIS, GIOTES, PAGE & BURLESON, P.C.
801 Washington Ave., Ste. 800
Waco, TX  76701-1289
Telephone:  (254) 297-7300
Fax:  (254) 297-7301

ATTORNEYS FOR TOM THOMPSON DBA
THOMPSON TRUCKING

## CERTIFICATE OF CONFERENCE

Counsel for Mr. Thompson contacted counsel for Mr. Kholi and Sam Kholi Enterprises, Inc., on December 16, 2009, and conferred about this Motion and Application. Counsel for Mr. Kholi and Sam Kholi Enterprises, Inc. opposes this motion and application.

/s/ Jack R. Crews
JACK R. CREWS

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the above and foregoing *"Tom Thompson d/b/a Thompson Trucking's Motion to Register Judgment"* has been electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all attorney(s) of record, in accordance with the FEDERAL RULES OF CIVIL PROCEDURE 5(b)(2)(D), on this the 17th day of December, 2009, addressed to:

ATTORNEYS FOR PLAINTIFF:

Jeffrey A. Armstrong
Greg White
John Palmer
Naman, Howell, Smith & Lee, L.L.P.
P. O. Box 1470
Waco, TX  76703-1470

/s/ Jack R. Crews
JACK R. CREWS

TOM R. THOMPSON D/B/A TOMPSON TRUCKING'S MOTION TO PERMIT
JUDGMENT REGISTRATION AND APPLICATION FOR POST-JUDGMENT TURNOVER RELIEF

033246/43351                                                                                          6

# EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| SAM KHOLI ENTERPRISES, INC. | § | |
| Plaintiff | § | |
| | § | |
| v. | § | |
| | § | |
| TOM R. THOMPSON | § | Civil Action No. W-08-CA-105 |
| DBA | § | |
| THOMPSON TRUCKING, | § | |
| Defendant, | § | |
| | § | |
| v. | § | |
| | § | |
| SAM KHOLI, | § | |
| Third-Party Defendant. | § | |

## AFFIDAVIT OF TOM R. THOMPSON

STATE OF TEXAS   §

COUNTY OF BELL   §

BEFORE ME, the undersigned notary public, on this day personally appeared TOM R. THOMPSON, who, after being by me duly sworn, upon his oath deposed and stated as follows:

1. "My name is Tom R. Thompson.  I am over eighteen (18) years of age, of sound mind, capable of making this affidavit, and fully competent to testify to the matters stated herein.

2.  "I am the Defendant/Counter-Plaintiff in the above-entitled and numbered cause, and I have personal knowledge of the facts stated in this affidavit.  My personal knowledge stems from my personal involvement in the facts recited in this affidavit, and such facts are true and correct.

3. "Prior to this litigation, I participated in negotiations with Sam Kholi, Third-Party Defendant herein, for the purchase of my trucking company.  During those

negotiations, Mr. Kholi made certain representations about his personal and business assets to me.

4. "Mr. Kholi told me that he had substantial real estate assets in the State of California worth approximately $30 million. These assets are represented by the e-mails and attachments attached hereto as Exhibit "A-1", which were previously admitted into evidence in the trial of this matter as Exhibits D-39, D-42, D-43, and D-45. Additionally, another deed accompanies this Affidavit as Exhibit "A-2" that shows Mr. Kholi has caused the recent transfer of at least one property located in California to his brother, Mr. Khouli Samer. Upon information and belief, Mr. Kholi also conveyed a second property to the Dehessy Corporation. I do not know what the connection is between Mr. Kholi and the Dehessy Corporation.

5. "During these negotiations, Mr. Kholi stated he owned bank account(s) in which between $4 million and $5 million was deposited.

6. "Mr. Kholi stated he owned substantial business assets which were headquartered in California. Mr. Kholi stated he was the owner of Sam Kholi Enterprises, Inc., Plaintiff/Counter-Defendant herein, which had assets equaling between $9 million and $10 million. Mr. Kholi also stated he owned a company known as "Payrolling.com." True and correct copies of records of business filings in the California Secretary of State's office for Payrolling.com and Payrolling.com Corporation are attached hereto as Exhibit "A-3. While Mr. Kholi is not referenced on these copies, during our negotiations Mr. Kholi represented to me

that the address listed for both Payrolling.com and Payrolling.com Corp. (4626 Albuquerque St., San Diego, CA 92109) is his business address."

7. "During our negotiations, Mr. Kholi informed me that he was looking at several different truck stops to potentially purchase.  Sometime after our negotiations fell apart and this dispute ensued, upon information and belief, Mr. Kholi purchased (or caused the purchase of) a truck stop in Amarillo, Texas and a trucking terminal in California.  When I found out about the truck stop in Amarillo, Texas, I drove there to take a look at it.  The truck stop is clearly associated with Sam. His religious message, "Jesus Christ is Lord, not a swear word," was visible all over it.  The truck stop had ten (10) semi tractors, and fifteen (15) 53 foot trailers covered with Mr. Kholi's name and his same religious message.  The tractors and trailers appeared to be stored on the property.  I do not know the value of these semi tractors or trailers, but I am sure the total value is far less than the amount of the Amended Judgment.

8. "I later learned, upon information and belief, the trucking terminal, or at least the real property on which it is located, in California had been purchased by Sam Kholi or on his behalf.  I am informed that the California location had dozens of tractors and trailers covered with Mr. Kholi's name and religious message.  The terminal is located in or near Fontana, San Bernardino County, California.

9.  "At no point in our negotiations did Mr. Kholi indicate or otherwise represent to me that he had any ownership interest of any assets located within the jurisdictional boundaries of the United States District Court for the Western District of Texas.  At no point in our negotiations did Mr. Kholi indicate or

otherwise represent to me that he had any assets located within the State of Texas,

save the trailers stored near Amarillo, Texas, though of course he now appears to

have an operation going in or near Amarillo, Texas."

Further Affiant sayeth not.

SIGNED this 16th day of December, 2009.

_____
TOM R. THOMPSON

SWORN TO AND SUBSCRIBED before me by TOM R. THOMPSON on the 16th day

of December, 2009, to certify which witness my hand and official seal.



NOTARY PUBLIC, STATE OF TEXAS

# EXHIBIT "A-1"

**Tom Thompson**

| | |
|---|---|
| **From:** | Jon Lacey [jon@laceyland.com] |
| **Sent:** | Friday, January 04, 2008 12:36 PM |
| **To:** | 'Tom Thompson' |
| **Subject:** | RE: Kholi / Thompson Deal |
| | |
| **Categories:** | Deal Making & legal |

Hello Tom,

As we discussed, I have forwarded the following 5 addresses to my title company for lien, legal description and ownership info. When I receive the info, I shall forward same.

1525-1527 Garnet Avenue, S.D. Ca. 92109, 4626 Albuquerque, S.D. Ca. 92109, 3650 Hancock Street, S.D. Ca. 92110, 208 S. 8th Street, Copperas Cove, Texas 76522, 931 Sea Ridge Dr., La Jolla, Ca. 92037

Jon

**From:** Tom Thompson [mailto:tomthompsontrucking@earthlink.net]
**Sent:** Thursday, January 03, 2008 11:56 AM
**To:** Jon (Sam's Attorney) Lacey
**Subject:** Kholi / Thompson Deal

Jon,

Please send me the address and legal discriptions of the California properties Sam has offered as collatteral on this transaction.

Thank you

Tom Thompson

THOMPSON 0571
62


DEFENDANT'S
EXHIBIT
D-39

**Tom Thompson**

| | |
|---|---|
| **From:** | Jon Lacey [jon@laceyland.com] |
| **Sent:** | Saturday, January 05, 2008 9:58 AM |
| **To:** | 'Tom Thompson' |
| **Subject:** | FW: Deed and Open trust deed |
| **Attachments:** | 4626 Albuquerque doc..pdf; 1525-1527 Garnet document.pdf; 3650 Hancock Street doc.pdf |

| | |
|---|---|
| **Importance:** | High |
| **Categories:** | Deal Making & legal |

**From:** First American Customer Service SD [mailto:TISC.SD.CustomerService@firstam.com]
**Sent:** Friday, January 04, 2008 10:59 AM
**To:** jon@laceyland.com
**Cc:** Parks, Scott
**Subject:** Deed and Open trust deed
**Importance:** High

Hi Jon,

The three property has the same Trust deed. 931 Sea Ridge Drive has no reference, Please provide APN.

Thank you

**First American Customer Service**
**ASC - San Diego**
tisc.sd.customerservice@firstam.com

To request Customer Service 24 hours a day, 7 days a week or to order your next Farming Package, you can visit our **BRAND NEW** website at www.firstamsandiegolinks.com.

THOMPSON 0574

DEFENDANT'S
EXHIBIT
D-42

·/.

RECORDING REQUESTED BY
Commonwealth Land Title Company
AND WHEN RECORDED MAIL TO:

15883

Sam Kholi Enterprises
8 333 Clairemont Mesa Blud
St 203
San Diego, Ca 92111
APN: 424-572-05
Escrow No: 03650742-499-MB2
Title No: 03650742-4

DOC # 2003-0295826

MAR 17, 2003 3:18 PM

OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
GREGORY J. SMITH, COUNTY RECORDER
FEES:      1021.00
DC:          0C

2003-0295826

Space above this line for Recorder's use

## GRANT DEED

**THE UNDERSIGNED GRANTOR(S) DECLARE(S)**
DOCUMENTARY TRANSFER TAX IS $ _1001.00_ , CITY TAX $ _0.00_
computed on full value of property conveyed,, AND

**FOR A VALUABLE CONSIDERATION,** receipt of which is hereby acknowledged,

Aldo Cerciello, Trustee of the ALDO CERCIELLO AND MANUELLA CERCIELLO FAMILY TRUST, UTD March 30, 1994

hereby GRANT(S) to

Sam Kholi Enterprises, Inc., a California corporation

the following described real property in the City of San Diego  County of San Diego, State of California:
**See Exhibit A attached hereto and made a part hereof.**

Commonly known as: 4626 Albuquerque Street, San Diego, CA

Dated: _February 5, 2003_

Aldo Cerciello, Trustee of the ALDO CERCIELLO AND
MANUELLA CERCIELLO FAMILY TRUST, UTD March 30,
1994

Aldo Cerciello, Trustee

STATE OF CALIFORNIA

COUNTY OF _San Diego_          ) SS:

On _Feb  6 2003_ , before me, _Marie E Berry_ Notary Public,
personally appeared _Aldo Cerciello_ ,
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the
person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature _Marie E Berry_

FOR NOTARY SEAL OR STAMP
MARIE E. BERRY
Commission # 1306877
Notary Public - California
San Diego County
My Comm. Expires Jun 22, 2005

THOMPSON 0575

**Exhibit A**

15884

All that certain real property situated in the County of San Diego, State of California, described as follows:

That portion of Lots 2 and 4, Block 1, Homeland Villas, in the City of San Diego, County of San Diego, State of California, according to Map thereof No. 1010, filed in the Office of the County Recorder of San Diego County, October 9, 1906, described as follows:

Beginning at the Northwesterly corner of said Lot 4; thence along the Northwesterly line of said Lot 4, North 62°26'45" East, 51.22 feet to the True Point of Beginning; thence North 14°37'05" West, 30.92 feet; thence North 62°33'25" East, 50.00 feet to a point in the Northeasterly line of said Lot 2; thence South 27°26'35" East along the Northeasterly line of said lots, 90.00 feet; thence South 62°33'25" West, 70.49 feet; thence North 14°37'05" West, 61.38 feet to the True Point of Beginning.

**THOMPSON 0576**



RECORDING REQUESTED BY
ADVANTAGE TITLE INC.

RECORDING REQUESTED BY:

**558**

AFTER RECORDING MAIL TO:
Pacific Trust Bank
P.O. Box 5227
Chula Vista, CA 91910

*Fll 8P*

DOC #   2007-0408003

JUN 18, 2007    8:00 AM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
GREGORY J. SMITH, COUNTY RECORDER
FEES:         30.00
PAGES:         8        DA:        1

LOAN NO. 7500000003

*879080-21*

[Space Above This Line For Recording Data]        2007-0408003

# DEED OF TRUST

THIS DEED OF TRUST ("Security Instrument") is made on **May 25, 2007.**
The trustor is **Sam Kholi, an Unmarried Man, as to Parcels 1 and 3 ;**
**Sam Kholi Enterprises, Inc., a California Corporation, as to Parcels 2 and 4  ("Borrower").**

The trustee is **Advantage Title Inc.** ("Trustee").

The beneficiary is **Pacific Trust Bank** which is organized and existing under the laws of the United States of America, and whose address is P.O. Box 5227, Chula Vista, CA 91912 ("Lender").

Borrower owes Lender the principal sum of **THREE MILLION FIVE HUNDRED THOUSAND** dollars (U.S. *$3,500,000.00)*. This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for monthly payments with the full debt, if not paid earlier, due and payable on **June 01, 2012.** This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in San Diego County, California:

*SEE LEGAL DESCRIPTION SCHEDULE "A" ATTACHED HERETO AND MADE A PART HEREOF.*

APN Numbers: 415-031-06-00 (Parcel 1) ; 441-530-62-00 (Parcel 2) ; 423-093-03-00 (Parcel 3) ; 424-572-05-00 (Parcel 4)

which have the following addresses:

**301 Sea Ridge Drive, La Jolla, CA 92037 (Parcel 1);**
**3650 Hancock Street, San Diego, CA 92110 (Parcel 2);**
**1525-1529 Garnet Avenue, San Diego, CA 92109 (Parcel 3);**
**4626 Albuquerque Street, San Diego, CA 92109 (Parcel 4)**  ("Subject Property")

**NOTICE TO BORROWER: THE NOTE SECURED BY THIS DEED OF TRUST MAY CONTAIN PROVISIONS FOR A VARIABLE INTEREST RATE.**

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property".

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

*This debt is additional security for Commercial Loan made to Sam Kholi Enterprises, Inc. in connection with Commercial Promissory Note dated May 25, 2007 in the amount of THREE MILLION FIVE HUNDRED THOUSAND dollars (U.S. $ 3,500,000.00) which provides for interest payment and the full debt, if not paid earlier, due and payable on June 01, 2012.*

CALIFORNIA-CROSS-LIEN DEED-PACIFIC TRUST BANK

THOMPSON 0577

**559**

*LOAN NO. 7500000003*

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2. **Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender shall be applied: first, to interest due; second, to principal due; and last, to any late charges due under the Note.

3. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations on time and directly to the person owed payment. Borrower shall promptly furnish Lender receipts evidencing payments.

   Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

4. **Hazard or Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 6.

   All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

   Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer with in 30 days of notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due.

   The 30-day period will begin when the notice is given.

   Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraph 1 or change the amount of the payments. If under paragraph 19 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

CALIFORNIA-CROSS-LIEN DEED-PACIFIC TRUST BANK

THOMPSON 0578

**560**

*LOAN NO. 7500000003*

5.  **Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.**  Borrower shall occupy, establish and use the property as Borrowers principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage, or impair the Property, allow the Property to deteriorate, or commit waste on the Property, Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence.

6.  **Protection of Lender's Rights in the Property.**  If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorney's fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 6, Lender does not have to do so.

    Any amounts disbursed by Lender under this paragraph 6 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

7.  **Inspection.**  Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

8.  **Condemnation.**  The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

    In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

**561**

*LOAN NO. 7500000003*

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds shall not extend or postpone the due date of the monthly payments referred to in paragraph 1 or change the amount of such payments.

9.  **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

10. **Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 15. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

11. **Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to the Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

12. **Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

13. **Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

14. **Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**562**

LOAN NO. 7500000003

15. **Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

   If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

16. **Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument, those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument; including, but not limited to, reasonable attorney's fees; and (d) takes such action as Lender may reasonably require at assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 15.

17. **Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 12 above and applicable law. The notice will state the name and address of the now Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law.

18. **Hazardous substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release or any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

   Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

   As used in this paragraph 18, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 18, "Environmental Law" means federal laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

CALIFORNIA-CROSS-LIEN DEED-PACIFIC TRUST BANK

THOMPSON 0581

**563**

LOAN NO. 7500000003

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

19. **Acceleration; Remedies.**  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraph 15 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 19, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

   If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of ;the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by applicable law to Borrower and to the other persons prescribed by applicable law. Trustee shall give public notice of sale to the persons and in the manner prescribed by applicable law. After the time required by applicable law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines, Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

   Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the trust of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

20. **Reconveyance.**  Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty and without charge to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs.

21. **Substitute Trustee.**  Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by applicable law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

22. **Request for Notices.**  Borrower requests that copies of the notices of default and sale be sent to Borrower's address which is the Property Address.

23. **Statement of Obligation Fee.**  Lender may collect a fee not to exceed the maximum amount permitted by law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

CALIFORNIA-CROSS-LIEN DEED-PACIFIC TRUST BANK

THOMPSON 0582

564

LOAN NO. 7500000003

24. **Waiver of Right of Revocation**: Third Party Trustor(s) hereby waives and relinquishes any right of revocation as provided in California Civil Code Section 2815.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

BORROWER(S) as to Parcels 1 and 3:

X _____

**Sam Kholi**

BORROWER(S) as to Parcels 2 and 4:

SAM KHOLI ENTERPRISES, INC., a California Corporation

X _____

**Sam Kholi, President of Sam Kholi Enterprises, Inc.**

State of ____CA____

County of ____San Diego____

On _June 5, 2007_ before me, _Brook Sheehan_____, a Notary Public
Personally appeared ___Sam Kholi_____, personally known to me (or proved
to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument
and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted,
executed the instrument.

_WITNESS my hand and official seal._

_Brook Sheehan_____ (Seal)

BROOK SHEEHAN
Commission # 1719168
Notary Public - California
San Diego County
My Comm. Expires Jan 21, 2011

CALIFORNIA-CROSS-LIEN DEED-PACIFIC TRUST BANK

THOMPSON 0583

565

Subdone A

EXHIBIT "A"

The land referred to in this report is situated in the County of San Diego, State of California, and is described as follows:

Parcel 1:

Lot 20 of Sun Gold Point, in the City of San Diego, County of San Diego, State of California, according to Map thereof No. 3216, filed in the Office of the County Recorder of San Diego County, April 14, 1955; excepting therefrom any portion thereof now or heretofore lying below the mean tide line of the Pacific Ocean.

Parcel 2:

Lots 15 and 16 of Pickett Industrial Center Subdivision, in the City of San Diego, County of San Diego, State of California, according to the Map thereof No. 6709, filed in the Office of the County Recorder of San Diego County August 19, 1970.

Parcel 3:

Lot 6, 7 and 8 in Block 218 of Pacific Beach, in the City of San Diego, County of San Diego, State of California, according to map thereof no. 854 and 791, filed in the office of the County Recorder of San Diego County, September 28, 1898 and December 29, 1894, respectively.

Parcel 4:

That portion of Lots 2 and 4, Block 1, Homeland Villas in the City of San Diego, County of San Diego, State of California, according to Map thereof No. 1010, filed in the Office of the County Recorder of San Diego County, October 9, 1906, described as follows:

Beginning at the Northwesterly corner of said Lot 4; thence along the Northwesterly line of said Lot 4, North 62° 26' 45" East, 51.22 feet to the True Point of Beginning; thence North 14° 37' 05" West, 30.92 feet; thence North 62° 33' 25" East, 50.00 feet to a point in the Northeasterly line of said Lot 2; thence South 27° 26' 35" East along the Northeasterly line of said Lots, 90.00 feet; thence South 62° 33' 25" West, 70.49 feet; thence North 14° 37' 05" West, 61.38 feet to the True Point of Beginning.

**THOMPSON 0584**

**Tom Thompson**

| | |
|---|---|
| **From:** | Jon Lacey [jon@laceyland.com] |
| **Sent:** | Saturday, January 05, 2008 9:58 AM |
| **To:** | 'Tom Thompson' |
| **Subject:** | FW: Deed and Open trust deed |
| **Attachments:** | 301 Sea Ridge Dr document.pdf |
| **Importance:** | High |
| **Categories:** | Deal Making & legal |

**From:** First American Customer Service SD [mailto:TISC.SD.CustomerService@firstam.com]
**Sent:** Friday, January 04, 2008 11:29 AM
**To:** jon@laceyland.com
**Subject:** RE: Deed and Open trust deed
**Importance:** High

Hi Jon,

Attached is the document for 301 Sea Ridge Dr.


Thank you

John


**First American Customer Service**
**ASC - San Diego**
tisc.sd.customerservice@firstam.com


To request Customer Service 24 hours a day, 7 days a week or to order your next Farming Package, you can visit our **BRAND NEW** website at www.firstamsandiegolinks.com.

**From:** Jon Lacey [mailto:jon@laceyland.com]
**Sent:** Friday, January 04, 2008 11:16 AM
**To:** First American Customer Service SD
**Subject:** RE: Deed and Open trust deed

Scott

I'm sorry the address is 301 Sea Ridge Dr. La Jolla, Ca. 92037.

Jon

**From:** First American Customer Service SD [mailto:TISC.SD.CustomerService@firstam.com]
**Sent:** Friday, January 04, 2008 10:59 AM
**To:** jon@laceyland.com

DEFENDANT'S EXHIBIT
D-43

**Cc:** Parks, Scott
**Subject:** Deed and Open trust deed
**Importance:** High

Hi Jon,

The three property has the same Trust deed. 931 Sea Ridge Drive has no reference, Please provide APN.


Thank you

**First American Customer Service**
**ASC - San Diego**
tisc.sd.customerservice@firstam.com

To request Customer Service 24 hours a day, 7 days a week or to order your next Farming Package, you can visit our **BRAND NEW** website at www.firstamsandiegolinks.com.

RECORDING REQUESTED BY

*California Title*

AND WHEN RECORDED MAIL THIS DEED AND TAX STATEMENTS TO:

NAME **SAM KHOLI**
ADDRESS **3519 Oceanfront Walk #C**
CITY & STATE **San Diego, CA 92109**

Title Order No.   249855-DJ
Escrow No.   27209-BP
Assessor's Parcel No.   415-031-06-00
Date   December 9, 2005

19755

DOC #   2005-1115962

DEC 29, 2005   2:26 PM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
GREGORY J. SMITH, COUNTY RECORDER
FEES:   6355.00
OC:   AFNF
PAGES:   2     2005-1115962

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## GRANT DEED

The undersigned declares that the documentary transfer tax is $6,325.00 and is computed on the full value of the interest or property conveyed. The property is located in the city of LA JOLLA.

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**MARY LYNNE PERRY, an unmarried woman**

does hereby GRANT to

**SAM KHOLI, an unmarried man**

the following described real property in the City of LA JOLLA, County of SAN DIEGO, State of California:

LOT 20

STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 3216, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, APRIL 14, 1955; EXCEPTING THEREFROM ANY PORTION THEREOF NOW OR HERETOFORE LYING BELOW THE MEAN HIGH TIDE LINE OF THE PACIFIC OCEAN.

_____
MARY LYNNE PERRY

STATE OF CALIFORNIA,
COUNTY OF ___San Diego___ }SS.

On December 12, 2005 before me, the undersigned Notary Public in and for said State, personally appeared MARY LYNNE PERRY, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument the person, or the entity on behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature __Anita Wood__



FOR NOTARY SEAL OR STAMP

ANITA WOOD
Commission # 1442015
Notary Public - California
San Diego County
My Comm. Expires Oct 24, 2007

THOMPSON 0587
MAIL TAX STATEMENTS AS DIRECTED ABOVE

5SSI 276A REV. 7/94

2

EXHIBIT "A"                    19756

LOT 20 OF SUN GOLD POINT, IN THE CITY OF SAN DIEGO, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 3216, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, APRIL 14, 1955; EXCEPTING THEREFROM ANY PORTION THEREOF NOW OR HERETOFORE LYING BELOW THE MEAN HIGH TIDE LINE OF THE PACIFIC OCEAN.

Exhibit A
ESTATE LENDING DEED OF TRUST -- ADJUSTABLE INTEREST RATE

**THOMPSON 0588**

C:\LEGAL\ESTATE\MORTGAGE\ARM.DOC

Recording requested by:
**CHICAGO TITLE COMPANY**

This document was prepared by

Please return this document after recording to:

**Pacific Trust Bank**

**P.O. Box 5227**
**Chula Vista, CA 91912**

14050

State of California

DOC # 2006-0371863

MAY 25, 2006     3:06 PM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
GREGORY J. SMITH, COUNTY RECORDER
FEES:           30.00
PAGES:          8       DA:     1

2006-0371863

# DEED OF TRUST
### (With Future Advance Clause)

1. **DATE AND PARTIES.** The date of this Deed of Trust (Security Instrument) is May 18, 2006 and the parties, their addresses and tax identification numbers, if required, are as follows:
TRUSTOR: **Sam Kholi, an Unmarried Man**

    **301 Sea Ridge Drive, La Jolla, CA 92037**

    ☐ If checked, refer to the attached Addendum incorporated herein, for additional Trustors, their signatures and acknowledgments.
TRUSTEE:

    **Chicago Title Company**
    **2365 Northside Drive**
    **San Diego, CA 92108**

    LENDER:

    **Pacific Trust Bank**
    **P.O. Box 5227 Chula Vista, CA 91912**

    **Organized and Existing Under the Laws of California**

2. **CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debt (defined below) and Trustor's performance under this Security Instrument, Trustor irrevocably grants, conveys and sells to Trustee, in trust for the benefit of Lender, with power of sale, the following described property:
**SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF**

    The property is located in _____ **San Diego** _____ at **301 Sea Ridge Drive**
                                              (County)

    _____ , _____ **La Jolla** _____ , California ____ **92037**
         (Address)                              (City)                                         (ZIP Code)
    Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, all water and riparian rights, ditches, and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above (all referred to as "Property").

3. **MAXIMUM OBLIGATION LIMIT.** The total principal amount secured by this Security Instrument at any one time shall not exceed $ **2,500,000.00** . This limitation of amount does not include interest and other fees and charges validly made pursuant to this Security Instrument. Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

4. **SECURED DEBT AND FUTURE ADVANCES.** The term "Secured Debt" is defined as follows:
    A. Debt incurred under the terms of all promissory note(s), contract(s), guaranty(s) or other evidence of debt described below and all their extensions, renewals, modifications or substitutions. *(Include items such as borrowers' names, note or contract amounts, interest rates (whether variable), maturity dates, etc.)*

        **A Promissory Note dated 05/18/2006**

(page 1 of 6)

iscription: San Diego CA Document-Year DocID 2006 371863 Page: 1 of 8

# EXHIBIT A                              **14051**

LOT 20 OF SUN GOLD POINT, IN THE CITY OF SAN DIEGO, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 3216, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, APRIL 14, 1955.

EXCEPTING THEREFROM ANY PORTION THEREOF NOW OR HERETOFORE LYING BELOW THE MEAN HIGH TIDE LINE OF THE PACIFIC OCEAN.

**THOMPSON 0590**

**14052**

B. All future advances from Lender to Trustor or other future obligations of Trustor to Lender under any promissory note, contract or guaranty, or other evidence of debt executed by Trustor in favor of Lender after this Security Instrument if this Security Instrument is specifically referenced on the evidence of other debt. If more than one person signs this Security Instrument, each Trustor agrees that this Security Instrument will secure all future advances and future obligations that are given to or incurred by any one or more Trustor, or any one or more Trustor and others. All future advances and other future obligations are secured by this Security Instrument even though all or part may not yet be advanced. All future advances and other future obligations are secured as if made on the date of this Security Instrument. Nothing in this Security Instrument shall constitute a commitment to make additional or future loans or advances in any amount. Any such commitment must be agreed to in a separate writing.

C. All additional sums advanced and expenses incurred by Lender for insuring, preserving or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

D. Performance of every obligation in this Security Instrument (including any subsequent instrument amending this Security Instrument) and any instrument now or later evidencing or securing any indebtedness secured by this Security Instrument.

This Security Instrument will not secure any other debt if Lender fails to give any required notice of the right of rescission.

5. **PAYMENTS.** Trustor agrees that all payments under the Secured Debt will be paid when due and in accordance with the terms of the Secured Debt and this Security Instrument.

6. **WARRANTY OF TITLE.** Trustor warrants that Trustor is or will be lawfully seized of the estate conveyed by this Security Instrument and has the right to irrevocably grant, convey and sell the Property to Trustee, in trust, with power of sale. Trustor also warrants that the Property is unencumbered, except for encumbrances of record.

7. **PRIOR SECURITY INTERESTS.** With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Trustor agrees:
   A. To make all payments when due and to perform or comply with all covenants.

   B. To promptly deliver to Lender any notices that Trustor receives from the holder.

   C. Not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written consent.

8. **CLAIMS AGAINST TITLE.** Trustor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Trustor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Trustor's payment. Trustor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Trustor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Trustor may have against parties who supply labor or materials to maintain or improve the Property.

9. **DUE ON SALE OR ENCUMBRANCE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of all or any part of the Property. This right is subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable. This covenant shall run with the Property and shall remain in effect until the Secured Debt is paid in full and this Security Instrument is released.

10. **PROPERTY CONDITION, ALTERATIONS AND INSPECTION.** Trustor will keep the Property in good condition and make all repairs that are reasonably necessary. Trustor shall not commit or allow any waste, impairment, or deterioration of the Property. Trustor will keep the Property free of noxious weeds and grasses. Trustor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Trustor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Trustor will notify Lender of all demands, proceedings, claims, and actions against Trustor, and of any loss or damage to the Property.

   Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Lender shall give Trustor notice at the time of or before an inspection specifying a reasonable purpose for the inspection. Any inspection of the Property shall be entirely for Lender's benefit and Trustor will in no way rely on Lender's inspection.

11. **AUTHORITY TO PERFORM.** If Trustor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Trustor appoints Lender as attorney in fact to sign Trustor's name or pay any amount necessary for performance. Lender's right to perform for Trustor shall not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's

**14053**

other rights under the law or this Security Instrument. If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may take all steps necessary to protect Lender's security interest in the Property, including completion of the construction.

12. **ASSIGNMENT OF LEASES AND RENTS.** Trustor irrevocably assigns, grants, and conveys, to Trustee, in trust for the benefit of Lender as additional security all the right, title and interest in the following (all referred to as Property): existing or future leases, subleases, licenses, guaranties and any other written or verbal agreements for the use and occupancy of the Property, including any extensions, renewals, modifications or replacements (all referred to as Leases); and rents, issues and profits (all referred to as Rents). In the event any item listed as Leases or Rents is determined to be personal property, this Assignment will also be regarded as a security agreement. Trustor will promptly provide Lender with copies of the Leases and will certify these Leases are true and correct copies. The existing Leases will be provided on execution of the Assignment, and all future Leases and any other information with respect to these Leases will be provided immediately after they are executed. Trustor may collect, receive, enjoy and use the Rents so long as Trustor is not in default.

Upon default, Trustor will receive any Rents in trust for Lender and will not commingle the Rents with any other funds. Trustor agrees that this Security Instrument is immediately effective between Trustor and Lender and effective as to third parties on the recording of this Assignment. This Security Instrument will remain effective during any statutory redemption period until the Secured Debts are satisfied. As long as this Assignment is in effect, Trustor warrants and represents that no default exists under the Leases, and the parties subject to the Leases have not violated any applicable law on leases, licenses and landlords and tenants.

13. **LEASEHOLDS; CONDOMINIUMS; PLANNED UNIT DEVELOPMENTS.** Trustor agrees to comply with the provisions of any lease if this Security Instrument is on a leasehold. If the Property includes a unit in a condominium or a planned unit development, Trustor will perform all of Trustor's duties under the covenants, by-laws, or regulations of the condominium or planned unit development.

14. **DEFAULT.** Trustor will be in default if any party obligated on the Secured Debt fails to make payment when due. Trustor will be in default if a breach occurs under the terms of this Security Instrument or any other document executed for the purpose of creating, securing or guarantying the Secured Debt. A good faith belief by Lender that Lender at any time is insecure with respect to any person or entity obligated on the Secured Debt or that the prospect of any payment or the value of the Property is impaired shall also constitute an event of default.

15. **REMEDIES ON DEFAULT.** In some instances, federal and state law will require Lender to provide Trustor with notice of the right to cure, or other notices and may establish time schedules for foreclosure actions. Subject to these limitations, if any, Lender may accelerate the Secured Debt and foreclose this Security Instrument in a manner provided by law if Trustor is in default.

At the option of Lender, all or any part of the agreed fees and charges, accrued interest and principal shall become immediately due and payable, after giving notice if required by law, upon the occurrence of a default or anytime thereafter. In addition, Lender shall be entitled to all the remedies provided by law, the terms of the Secured Debt, this Security Instrument and any related documents, including without limitation, the power to sell the Property.

If Lender elects to foreclose by exercise of the power of sale, Lender will declare the entire Secured Debts due and payable by delivering to Trustee in this Security Instrument and any evidence of the Secured Debts, receipts and evidence of expenditures made and secured, as Trustee requires. When the legally prescribed time passes after Trustee or Lender duly records a notice of default, the Trustee, Lender or other person authorized to take the sale will give a notice of sale as required by law and will cause the Property to be sold at the time and place fixed in the notice of sale. Lender may rescind any notice of default at any time before the Property's sale. Rescission will occur when Lender executes and records a notice of rescission that cancels any prior notice of default and any related acceleration of the Secured Debts. Lender's rescission will not waive any default then existing or subsequently occurring or preclude Lender exercising its remedies, including the power of sale, at another time.

The Property can be sold as a whole or in separate parcels and in any order that Trustee decides. The Property will be sold to the highest bidder for cash in lawful money of the United States, payable at sale time. The Property can be sold to anyone, including Trustor, Trustee or Lender. Trustee may postpone the sale of any part of the Property by public announcement at the time and place of this sale and afterwards at the time fixed by the preceding postponement. Upon any sale of the Property, Trustee will make and deliver a special or limited warranty deed that conveys the property sold to the purchaser or purchasers. Under this special or limited warranty deed, Trustee will covenant that Trustee has not caused or allowed a lien or an encumbrance to burden the Property and that Trustee will specially warrant and defend the Property's title to the purchaser or purchasers at the sale against all lawful claims and demand of all persons claiming by, through or under Trustee. The deed's recital of facts will be conclusive proof of the truthfulness of these facts.

14054

The proceeds from the Property's sale will be applied to the sale expenses, Trustee's expenses, Lender's attorneys' fees due on Trustor's default, sums that Trustee or Lender paid for procuring a title search of the Property's title subsequent to the execution of this Security Instrument, all outstanding amounts due under this Security Instrument and the remainder to anyone legally entitled to the remaining amounts due.

All remedies are distinct, cumulative and not exclusive, and the Lender is entitled to all remedies provided at law or equity, whether or not expressly set forth. The acceptance by Lender of any sum in payment or partial payment on the Secured Debt after the balance is due or is accelerated or after foreclosure proceedings are filed shall not constitute a waiver of Lender's right to require complete cure of any existing default. By not exercising any remedy on Trustor's default, Lender does not waive Lender's right to later consider the event a default if it continues or happens again.

16. **EXPENSES; ADVANCES ON COVENANTS; ATTORNEYS' FEES; COLLECTION COSTS.** Except when prohibited by law, Trustor agrees to pay all of Lender's expenses if Trustor breaches any covenant (including, but not limited to, advances and expenses as described in the AUTHORITY TO PERFORM and INSURANCE sections) in this Security Instrument. Trustor will also pay on demand any amount incurred by Lender for insuring, inspecting, preserving or otherwise protecting the Property and Lender's security interest. These expenses will bear interest from the date of the payment until paid in full at the highest interest rate in effect as provided in the terms of the Secured Debt. Trustor agrees to pay all costs and expenses incurred by Lender in collecting, enforcing or protecting Lender's rights and remedies under this Security Instrument. This amount may include, but is not limited to, attorneys' fees, court costs, and other legal expenses. This Security Instrument shall remain in effect until released. Trustor agrees to pay for any recordation costs of such release.

17. **ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), and all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substances," "hazardous waste" or "hazardous substance" under any Environmental Law.

Trustor represents, warrants and agrees that:

   A. Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance is or will be located, stored or released on or in the Property. This restriction does not apply to small quantities of Hazardous Substances that are generally recognized to be appropriate for the normal use and maintenance of the Property.

   B. Except as previously disclosed and acknowledged in writing to Lender, Trustor and every tenant have been, are, and shall remain in full compliance with any applicable Environmental Law.

   C. Trustor shall immediately notify Lender if a release or threatened release of a Hazardous Substance occurs on, under or about the Property or there is a violation of any Environmental Law concerning the Property. In such an event, Trustor shall take all necessary remedial action in accordance with any Environmental Law.

   D. Trustor shall immediately notify Lender in writing as soon as Trustor has reason to believe there is any pending or threatened investigation, claim, or proceeding relating to the release or threatened release of any Hazardous Substance or the violation of any Environmental Law.

18. **CONDEMNATION.** Trustor will give Lender prompt notice of any pending or threatened action, by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Trustor authorizes Lender to intervene in Trustor's name in any of the above described actions or claims. Trustor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds shall be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

19. **INSURANCE.** Trustor shall keep Property insured against loss by fire, flood, theft and other hazards and risks reasonably associated with the Property due to its type and location. This insurance shall be maintained in the amounts and for the periods that Lender requires. What Lender requires pursuant to the preceding two sentences can change during the term of the Secured Debt. The insurance carrier providing the insurance shall be chosen by Trustor subject to Lender's approval, which shall not be unreasonably withheld. If Trustor fails to maintain the coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property according to the terms of this Security Instrument.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard "mortgage clause" and, where applicable, "loss payee clause." Trustor shall immediately notify Lender of cancellation or termination of the insurance. Lender shall have the right to hold the policies and renewals. If Lender requires, Trustor shall immediately give to Lender all receipts of paid premiums and renewal notices. Upon loss, Trustor shall give immediate notice to the insurance carrier and Lender. Lender may make proof of loss if not made immediately by Trustor.

Express ©1994 Bankers Systems, Inc., St. Cloud, MN Form RE-DT-CA 3/11/2004

*(page 4 of 6)*

VMP-C165(CA) (0403)

**THOMPSON 0593**

escription: San Diego,CA Document-Year.DocID 2006.371863 Page: 5 of 8

**14055**

Unless otherwise agreed in writing, all insurance proceeds shall be applied to the restoration or repair of the Property or to the Secured Debt, whether or not then due, at Lender's option. Any application of proceeds to principal shall not extend or postpone the due date of the scheduled payment nor change the amount of any payment. Any excess will be paid to the Trustor. If the Property is acquired by Lender, Trustor's right to any insurance policies and proceeds resulting from damage to the Property before the acquisition shall pass to Lender to the extent of the Secured Debt immediately before the acquisition.

20. **ESCROW FOR TAXES AND INSURANCE.** Unless otherwise provided in a separate agreement, Trustor will not be required to pay to Lender funds for taxes and insurance in escrow.

21. **FINANCIAL REPORTS AND ADDITIONAL DOCUMENTS.** Trustor will provide to Lender upon request, any financial statement or information Lender may deem reasonably necessary. Trustor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Trustor's obligations under this Security Instrument and Lender's lien status on the Property.

22. **JOINT AND INDIVIDUAL LIABILITY; CO-SIGNERS; SUCCESSORS AND ASSIGNS BOUND.** All duties under this Security Instrument are joint and individual. If Trustor signs this Security Instrument but does not sign an evidence of debt, Trustor does so only to mortgage Trustor's interest in the Property to secure payment of the Secured Debt and Trustor does not agree to be personally liable on the Secured Debt. Trustor agrees that Lender and any party to this Security Instrument may extend, modify or make any change in the terms of this Security Instrument or any evidence of debt without Trustor's consent. Such a change will not release Trustor from the terms of this Security Instrument. The duties and benefits of this Security Instrument shall bind and benefit the successors and assigns of Trustor and Lender.

23. **APPLICABLE LAW; SEVERABILITY; INTERPRETATION.** This Security Instrument is governed by the laws of the jurisdiction in which Lender is located, except to the extent otherwise required by the laws of the jurisdiction where the Property is located. This Security Instrument is complete and fully integrated. This Security Instrument may not be amended or modified by oral agreement. Any section in this Security Instrument, attachments, or any agreement related to the Secured Debt that conflicts with applicable law will not be effective, unless that law expressly or impliedly permits the variations by written agreement. If any section of this Security Instrument cannot be enforced according to its terms, that section will be severed and will not affect the enforceability of the remainder of this Security Instrument. Whenever used, the singular shall include the plural and the plural the singular. The captions and headings of the sections of this Security Instrument are for convenience only and are not to be used to interpret or define the terms of this Security Instrument. Time is of the essence in this Security Instrument.

24. **SUCCESSOR TRUSTEE.** Lender, at Lender's option, may from time to time remove Trustee and appoint a successor trustee without any other formality than the designation in writing. The successor trustee, without conveyance of the Property, shall succeed to all the title, power and duties conferred upon Trustee by this Security Instrument and applicable law.

25. **NOTICE.** Unless otherwise required by law, any notice shall be given by delivering it or by mailing it by first class mail to the appropriate party's address on page 1 of this Security Instrument, or to any other address designated in writing. Notice to one trustor will be deemed to be notice to all trustors. Lender and Trustor request that copies of any notice of default or notice of sale under a superior instrument be sent to Lender and Trustor at the addresses listed in the DATE AND PARTIES section.

26. **WAIVERS.** Except to the extent prohibited by law, Trustor waives all appraisement or marshalling of assets relating to the Property.

27. **STATEMENT OF OBLIGATION.** Lender may collect a fee not to exceed the maximum allowed by applicable law for furnishing the statement of obligation as provided in Section 2943 of the Civil Code of California.

28. **SPOUSE'S SEPARATE PROPERTY.** Any Trustor who is a married person expressly agrees that recourse may be had against his or her separate property.

*(page 5 of 6)*

escription: San Diego,CA Document-Year.DocID 2006 377863 Page: 6 of 8

14056

**29. OTHER TERMS.** If checked, the following are applicable to this Security Instrument:

☒ **Line of Credit.** The Secured Debt includes a revolving line of credit provision. Although the Secured Debt may be reduced to a zero balance, this Security Instrument will remain in effect until released.

☐ **Construction Loan.** This Security Instrument secures an obligation incurred for the construction of an improvement on the Property.

☐ **Fixture Filing.** Trustor grants to Lender a security interest in all goods that Trustor owns now or in the future and that are or will become fixtures related to the Property. This Security Instrument suffices as a financing statement and any carbon, photographic or other reproduction may be filed of record for purposes of Article 9 of the Uniform Commercial Code.

☐ **Riders.** The covenants and agreements of each of the riders checked below are incorporated into and supplement and amend the terms of this Security Instrument. [Check all applicable boxes]
☐ Condominium Rider ☐ Planned Unit Development Rider ☐ Other _____

☐ **Additional Terms.**

**SIGNATURES:** By signing below, Trustor agrees to the terms and covenants contained in this Security Instrument and in any attachments. Trustor also acknowledges receipt of a copy of this Security Instrument on the date stated on page 1.

(Signature) **Sam Kholi**          (Date) 5/14/06          (Signature)          (Date)

**ACKNOWLEDGMENT:**

(Individual) STATE OF California          COUNTY OF San Diego _____ ss.
On this 19th day of May 2006 before me Fahi J. Morhret, a notary public, personally appeared Sam Kholi

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

[Seal: FAHI J. MORHRET / Commission # 1428757 / Notary Public - California / San Diego County / My Comm. Expires Jul 4, 2007]

Signature _____

Name (typed or printed)

My commission expires: July 4, 2007

---

### REQUEST FOR FULL RECONVEYANCE

To Trustee:

The undersigned is the holder of the note or notes secured by this Deed of Trust, which was recorded in the office of the Recorder of _____ County, State of California, in book _____ , page _____ of official records. Said note or notes, together with all other indebtedness secured by this Deed of Trust, have been paid in full. You are hereby directed to cancel said note or notes and this Deed of Trust, which are delivered hereby, and to reconvey, without warranty, all the estate now held by you under this Deed of Trust to the person or persons legally entitled thereto.

Dated: _____

Assessor's Identification Number _____ - _____ - _____

**THOMPSON 0595**

Description: San Diego CA Document-Year.DocID 2006 371863 Page: 7 of 8

8

14057

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _San Diego_ } ss.

On _May 19 2006_ before me, _Patti J. Mortweet, Notary Public_
Date                               Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared _Sam Kholi_
                                    Name(s) of Signer(s)

☐ personally known to me

☑ proved to me on the basis of satisfactory evidence
to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or the
entity upon behalf of which the person(s) acted,
executed the instrument.

PATTI J. MORTWEET
Commission # 1428757
Notary Public - California
San Diego County
My Comm. Expires Jul 4, 2007

Place Notary Seal Above

WITNESS my hand and official seal.

Signature of Notary Public

——————— OPTIONAL ———————

*Though the information below is not required by law, it may prove valuable to persons relying on the document
and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**
Title or Type of Document: _Deed of Trust_

Document Date: _5/18/06_            Number of Pages: _6_

Signer(s) Other Than Named Above: _N/A_

**Capacity(ies) Claimed by Signer(s)**

| Signer's Name: _____ | Signer's Name: _____ |
|---|---|
| ☐ Individual | ☐ Individual |
| ☐ Corporate Officer — Title(s): ___ | ☐ Corporate Officer — Title(s): ___ |
| ☐ Partner — ☐ Limited ☐ General | ☐ Partner — ☐ Limited ☐ General |
| ☐ Attorney in Fact | ☐ Attorney in Fact |
| ☐ Trustee | ☐ Trustee |
| ☐ Guardian or Conservator | ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer Is Representing: _____ | Signer Is Representing: _____ |

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

© 2004 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402    Item No. 5907    Reorder: Call Toll-Free 1-800-876-6827

**THOMPSON 0596**

scription: San Diego CA Document-Year.DocID 2006 371863 Page: 8 of 9

Recording requested by:
CHICAGO TITLE COMPANY

This document was prepared by

Please return this document after recording to:

Pacific Trust Bank                    **15108**

P.O. Box 5227
Chula Vista, CA 91912          **AI
7P**

**DOC #   2006-0488736**

JUL 11, 2006      4:10 PM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
GREGORY J. SMITH, COUNTY RECORDER
FEES:        27.00
PAGES:        7       DA:    1

6080 24080-5
State of California

## DEED OF TRUST
(With Future Advance Clause)

**2006-0488736**

1. **DATE AND PARTIES.** The date of this Deed of Trust (Security Instrument) is **Jul 03, 2006**, and the parties, their addresses and tax identification numbers, if required, are as follows:
   TRUSTOR: **Sam Kholi, an Unmarried Man**

       **301 Sea Ridge Drive, La Jolla, CA 92037**

   ☐ If checked, refer to the attached Addendum incorporated herein, for additional Trustors, their signatures and acknowledgments.
   TRUSTEE:
       **Chicago Title Company
       2365 Northside Drive
       San Diego, CA 92108**

   LENDER:
       **Pacific Trust Bank
       P.O. Box 5227 Chula Vista, CA 91912**

       **Organized and Existing Under the Laws of California**

2. **CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debt (defined below) and Trustor's performance under this Security Instrument, Trustor irrevocably grants, conveys and sells to Trustee, in trust for the benefit of Lender, with power of sale, the following described property:
   **SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF COMPRISING OF ONE PAGE**

   The property is located in _____**San Diego**_____ at **301 Sea Ridge Drive**
                                          (County)
   _____ , _____**La Jolla**_____ , California ____**92037**____
        (Address)                          (City)                              (ZIP Code)
   Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, all water and riparian rights, ditches, and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above (all referred to as "Property").

3. **MAXIMUM OBLIGATION LIMIT.** The total principal amount secured by this Security Instrument at any one time shall not exceed $ **660,000.00**_____ . This limitation of amount does not include interest and other fees and charges validly made pursuant to this Security Instrument. Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

4. **SECURED DEBT AND FUTURE ADVANCES.** The term "Secured Debt" is defined as follows:
   A. Debt incurred under the terms of all promissory note(s), contract(s), guaranty(s) or other evidence of debt described below and all their extensions, renewals, modifications or substitutions. *(Include items such as borrowers' names, note or contract amounts, interest rates (whether variable), maturity dates, etc.)*
       **A Promissory Note dated 07/03/2006**

CALIFORNIA - DEED OF TRUST (NOT FOR FNMA, FHLMC, FHA OR VA USE)
Express © 1994 Bankers Systems, Inc., St. Cloud, MN Form RE-DT-CA 3/11/2004
VMP®-C165(CA) (0403)                    VMP Mortgage Solutions, Inc. (800)521-7291

**7000000205**
*(page 1 of 6)*

**THOMPSON 0597**

iscription: San Diego CA Document-Year DocID 2006 488736 Page: 1 of 7

**15109**

B. All future advances from Lender to Trustor or other future obligations of Trustor to Lender under any promissory note, contract or guaranty, or other evidence of debt executed by Trustor in favor of Lender after this Security Instrument if this Security Instrument is specifically referenced on the evidence of other debt. If more than one person signs this Security Instrument, each Trustor agrees that this Security Instrument will secure all future advances and future obligations that are given to or incurred by any one or more Trustor, or any one or more Trustor and others. All future advances and other future obligations are secured by this Security Instrument even though all or part may not yet be advanced. All future advances and other future obligations are secured as if made on the date of this Security Instrument. Nothing in this Security Instrument shall constitute a commitment to make additional or future loans or advances in any amount. Any such commitment must be agreed to in a separate writing.

C. All additional sums advanced and expenses incurred by Lender for insuring, preserving or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

D. Performance of every obligation in this Security Instrument (including any subsequent instrument amending this Security Instrument) and any instrument now or later evidencing or securing any indebtedness secured by this Security Instrument.

This Security Instrument will not secure any other debt if Lender fails to give any required notice of the right of rescission.

5. **PAYMENTS.** Trustor agrees that all payments under the Secured Debt will be paid when due and in accordance with the terms of the Secured Debt and this Security Instrument.

6. **WARRANTY OF TITLE.** Trustor warrants that Trustor is or will be lawfully seized of the estate conveyed by this Security Instrument and has the right to irrevocably grant, convey and sell the Property to Trustee, in trust, with power of sale. Trustor also warrants that the Property is unencumbered, except for encumbrances of record.

7. **PRIOR SECURITY INTERESTS.** With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Trustor agrees:
   A. To make all payments when due and to perform or comply with all covenants.

   B. To promptly deliver to Lender any notices that Trustor receives from the holder.

   C. Not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written consent.

8. **CLAIMS AGAINST TITLE.** Trustor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Trustor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Trustor's payment. Trustor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Trustor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Trustor may have against parties who supply labor or materials to maintain or improve the Property.

9. **DUE ON SALE OR ENCUMBRANCE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of all or any part of the Property. This right is subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable. This covenant shall run with the Property and shall remain in effect until the Secured Debt is paid in full and this Security Instrument is released.

10. **PROPERTY CONDITION, ALTERATIONS AND INSPECTION.** Trustor will keep the Property in good condition and make all repairs that are reasonably necessary. Trustor shall not commit or allow any waste, impairment, or deterioration of the Property. Trustor will keep the Property free of noxious weeds and grasses. Trustor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Trustor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Trustor will notify Lender of all demands, proceedings, claims, and actions against Trustor, and of any loss or damage to the Property.

Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Lender shall give Trustor notice at the time of or before an inspection specifying a reasonable purpose for the inspection. Any inspection of the Property shall be entirely for Lender's benefit and Trustor will in no way rely on Lender's inspection.

11. **AUTHORITY TO PERFORM.** If Trustor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Trustor appoints Lender as attorney in fact to sign Trustor's name or pay any amount necessary for performance. Lender's right to perform for Trustor shall not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's

Exßerß® ©1994 Bankers Systems, Inc., St. Cloud, MN Form RE-DT-CA 3/11/2004
VMP®-C185(CA) (0403)

**THOMPSON 0598**

**15110**

other rights under the law or this Security Instrument. If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may take all steps necessary to protect Lender's security interest in the Property, including completion of the construction.

12. **ASSIGNMENT OF LEASES AND RENTS.** Trustor irrevocably assigns, grants, and conveys, to Trustee, in trust for the benefit of Lender as additional security all the right, title and interest in the following (all referred to as Property): existing or future leases, subleases, licenses, guaranties and any other written or verbal agreements for the use and occupancy of the Property, including any extensions, renewals, modifications or replacements (all referred to as Leases); and rents, issues and profits (all referred to as Rents). In the event any item listed as Leases or Rents is determined to be personal property, this Assignment will also be regarded as a security agreement. Trustor will promptly provide Lender with copies of the Leases and will certify these Leases are true and correct copies. The existing Leases will be provided on execution of the Assignment, and all future Leases and any other information with respect to these Leases will be provided immediately after they are executed. Trustor may collect, receive, enjoy and use the Rents so long as Trustor is not in default.

Upon default, Trustor will receive any Rents in trust for Lender and will not commingle the Rents with any other funds. Trustor agrees that this Security Instrument is immediately effective between Trustor and Lender and effective as to third parties on the recording of this Assignment. This Security Instrument will remain effective during any statutory redemption period until the Secured Debts are satisfied. As long as this Assignment is in effect, Trustor warrants and represents that no default exists under the Leases, and the parties subject to the Leases have not violated any applicable law on leases, licenses and landlords and tenants.

13. **LEASEHOLDS; CONDOMINIUMS; PLANNED UNIT DEVELOPMENTS.** Trustor agrees to comply with the provisions of any lease if this Security Instrument is on a leasehold. If the Property includes a unit in a condominium or a planned unit development, Trustor will perform all of Trustor's duties under the covenants, by-laws, or regulations of the condominium or planned unit development.

14. **DEFAULT.** Trustor will be in default if any party obligated on the Secured Debt fails to make payment when due. Trustor will be in default if a breach occurs under the terms of this Security Instrument or any other document executed for the purpose of creating, securing or guarantying the Secured Debt. A good faith belief by Lender that Lender at any time is insecure with respect to any person or entity obligated on the Secured Debt or that the prospect of any payment or the value of the Property is impaired shall also constitute an event of default.

15. **REMEDIES ON DEFAULT.** In some instances, federal and state law will require Lender to provide Trustor with notice of the right to cure, or other notices and may establish time schedules for foreclosure actions. Subject to these limitations, if any, Lender may accelerate the Secured Debt and foreclose this Security Instrument in a manner provided by law if Trustor is in default.

At the option of Lender, all or any part of the agreed fees and charges, accrued interest and principal shall become immediately due and payable, after giving notice if required by law, upon the occurrence of a default or anytime thereafter. In addition, Lender shall be entitled to all the remedies provided by law, the terms of the Secured Debt, this Security Instrument and any related documents, including without limitation, the power to sell the Property.

If Lender elects to foreclose by exercise of the power of sale, Lender will declare the entire Secured Debts due and payable by delivering to Trustee in this Security Instrument and any evidence of the Secured Debts, receipts and evidence of expenditures made and secured, as Trustee requires. When the legally prescribed time passes after Trustee or Lender duly records a notice of default, the Trustee, Lender or other person authorized to take the sale will give a notice of sale as required by law and will cause the Property to be sold at the time and place fixed in the notice of sale. Lender may rescind any notice of default at any time before the Property's sale. Rescission will occur when Lender executes and records a notice of rescission that cancels any prior notice of default and any related acceleration of the Secured Debts. Lender's rescission will not waive any default then existing or subsequently occurring or preclude Lender exercising its remedies, including the power of sale, at another time.

The Property can be sold as a whole or in separate parcels and in any order that Trustee decides. The Property will be sold to the highest bidder for cash in lawful money of the United States, payable at sale time. The Property can be sold to anyone, including Trustor, Trustee or Lender. Trustee may postpone the sale of any part of the Property by public announcement at the time and place of this sale and afterwards at the time fixed by the preceding postponement. Upon any sale of the Property, Trustee will make and deliver a special or limited warranty deed that conveys the property sold to the purchaser or purchasers. Under this special or limited warranty deed, Trustee will covenant that Trustee has not caused or allowed a lien or an encumbrance to burden the Property and that Trustee will specially warrant and defend the Property's title to the purchaser or purchasers at the sale against all lawful claims and demand of all persons claiming by, through or under Trustee. The deed's recital of facts will be conclusive proof of the truthfulness of these facts.

Express® Ⓒ 1994 Bankers Systems, Inc., St. Cloud, MN Form RE-DT-CA 3/11/2004
VMP-C165(CA) (0403)

**THOMPSON 0599**

**15111**

The proceeds from the Property's sale will be applied to the sale expenses, Trustee's expenses, Lender's attorneys' fees due on Trustor's default, sums that Trustee or Lender paid for procuring a title search of the Property's title subsequent to the execution of this Security Instrument, all outstanding amounts due under this Security Instrument and the remainder to anyone legally entitled to the remaining amounts due.

All remedies are distinct, cumulative and not exclusive, and the Lender is entitled to all remedies provided at law or equity, whether or not expressly set forth. The acceptance by Lender of any sum in payment or partial payment on the Secured Debt after the balance is due or is accelerated or after foreclosure proceedings are filed shall not constitute a waiver of Lender's right to require complete cure of any existing default. By not exercising any remedy on Trustor's default, Lender does not waive Lender's right to later consider the event a default if it continues or happens again.

16. **EXPENSES; ADVANCES ON COVENANTS; ATTORNEYS' FEES; COLLECTION COSTS.** Except when prohibited by law, Trustor agrees to pay all of Lender's expenses if Trustor breaches any covenant (including, but not limited to, advances and expenses as described in the AUTHORITY TO PERFORM and INSURANCE sections) in this Security Instrument. Trustor will also pay on demand any amount incurred by Lender for insuring, inspecting, preserving or otherwise protecting the Property and Lender's security interest. These expenses will bear interest from the date of the payment until paid in full at the highest interest rate in effect as provided in the terms of the Secured Debt. Trustor agrees to pay all costs and expenses incurred by Lender in collecting, enforcing or protecting Lender's rights and remedies under this Security Instrument. This amount may include, but is not limited to, attorneys' fees, court costs, and other legal expenses. This Security Instrument shall remain in effect until released. Trustor agrees to pay for any recordation costs of such release.

17. **ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), and all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substances," "hazardous waste" or "hazardous substance" under any Environmental Law.

Trustor represents, warrants and agrees that:

A. Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance is or will be located, stored or released on or in the Property. This restriction does not apply to small quantities of Hazardous Substances that are generally recognized to be appropriate for the normal use and maintenance of the Property.

B. Except as previously disclosed and acknowledged in writing to Lender, Trustor and every tenant have been, are, and shall remain in full compliance with any applicable Environmental Law.

C. Trustor shall immediately notify Lender if a release or threatened release of a Hazardous Substance occurs on, under or about the Property or there is a violation of any Environmental Law concerning the Property. In such an event, Trustor shall take all necessary remedial action in accordance with any Environmental Law.

D. Trustor shall immediately notify Lender in writing as soon as Trustor has reason to believe there is any pending or threatened investigation, claim, or proceeding relating to the release or threatened release of any Hazardous Substance or the violation of any Environmental Law.

18. **CONDEMNATION.** Trustor will give Lender prompt notice of any pending or threatened action, by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Trustor authorizes Lender to intervene in Trustor's name in any of the above described actions or claims. Trustor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds shall be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

19. **INSURANCE.** Trustor shall keep Property insured against loss by fire, flood, theft and other hazards and risks reasonably associated with the Property due to its type and location. This insurance shall be maintained in the amounts and for the periods that Lender requires. What Lender requires pursuant to the preceding two sentences can change during the term of the Secured Debt. The insurance carrier providing the insurance shall be chosen by Trustor subject to Lender's approval, which shall not be unreasonably withheld. If Trustor fails to maintain the coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property according to the terms of this Security Instrument.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard "mortgage clause" and, where applicable, "loss payee clause." Trustor shall immediately notify Lender of cancellation or termination of the insurance. Lender shall have the right to hold the policies and renewals. If Lender requires, Trustor shall immediately give to Lender all receipts of paid premiums and renewal notices. Upon loss, Trustor shall give immediate notice to the insurance carrier and Lender. Lender may make proof of loss if not made immediately by Trustor.

ExGereⓇ ©1994 Bankers Systems, Inc., St. Cloud, MN Form RE-DT-CA 3/11/2004

VMPⓇ-C165(CA) (0403)

7000000205
*(page 4 of 6)*

**15112**

Unless otherwise agreed in writing, all insurance proceeds shall be applied to the restoration or repair of the Property or to the Secured Debt, whether or not then due, at Lender's option. Any application of proceeds to principal shall not extend or postpone the due date of the scheduled payment nor change the amount of any payment. Any excess will be paid to the Trustor. If the Property is acquired by Lender, Trustor's right to any insurance policies and proceeds resulting from damage to the Property before the acquisition shall pass to Lender to the extent of the Secured Debt immediately before the acquisition.

20. **ESCROW FOR TAXES AND INSURANCE.** Unless otherwise provided in a separate agreement, Trustor will not be required to pay to Lender funds for taxes and insurance in escrow.

21. **FINANCIAL REPORTS AND ADDITIONAL DOCUMENTS.** Trustor will provide to Lender upon request, any financial statement or information Lender may deem reasonably necessary. Trustor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Trustor's obligations under this Security Instrument and Lender's lien status on the Property.

22. **JOINT AND INDIVIDUAL LIABILITY; CO-SIGNERS; SUCCESSORS AND ASSIGNS BOUND.** All duties under this Security Instrument are joint and individual. If Trustor signs this Security Instrument but does not sign an evidence of debt, Trustor does so only to mortgage Trustor's interest in the Property to secure payment of the Secured Debt and Trustor does not agree to be personally liable on the Secured Debt. Trustor agrees that Lender and any party to this Security Instrument may extend, modify or make any change in the terms of this Security Instrument or any evidence of debt without Trustor's consent. Such a change will not release Trustor from the terms of this Security Instrument. The duties and benefits of this Security Instrument shall bind and benefit the successors and assigns of Trustor and Lender.

23. **APPLICABLE LAW; SEVERABILITY; INTERPRETATION.** This Security Instrument is governed by the laws of the jurisdiction in which Lender is located, except to the extent otherwise required by the laws of the jurisdiction where the Property is located. This Security Instrument is complete and fully integrated. This Security Instrument may not be amended or modified by oral agreement. Any section in this Security Instrument, attachments, or any agreement related to the Secured Debt that conflicts with applicable law will not be effective, unless that law expressly or impliedly permits the variations by written agreement. If any section of this Security Instrument cannot be enforced according to its terms, that section will be severed and will not affect the enforceability of the remainder of this Security Instrument. Whenever used, the singular shall include the plural and the plural the singular. The captions and headings of the sections of this Security Instrument are for convenience only and are not to be used to interpret or define the terms of this Security Instrument. Time is of the essence in this Security Instrument.

24. **SUCCESSOR TRUSTEE.** Lender, at Lender's option, may from time to time remove Trustee and appoint a successor trustee without any other formality than the designation in writing. The successor trustee, without conveyance of the Property, shall succeed to all the title, power and duties conferred upon Trustee by this Security Instrument and applicable law.

25. **NOTICE.** Unless otherwise required by law, any notice shall be given by delivering it or by mailing it by first class mail to the appropriate party's address on page 1 of this Security Instrument, or to any other address designated in writing. Notice to one trustor will be deemed to be notice to all trustors. Lender and Trustor request that copies of any notice of default or notice of sale under a superior instrument be sent to Lender and Trustor at the addresses listed in the DATE AND PARTIES section.

26. **WAIVERS.** Except to the extent prohibited by law, Trustor waives all appraisement or marshalling of assets relating to the Property.

27. **STATEMENT OF OBLIGATION.** Lender may collect a fee not to exceed the maximum allowed by applicable law for furnishing the statement of obligation as provided in Section 2943 of the Civil Code of California.

28. **SPOUSE'S SEPARATE PROPERTY.** Any Trustor who is a married person expressly agrees that recourse may be had against his or her separate property.

7000000205
*(page 5 of 6)*

*SK*

Experex ©1994 Bankers Systems, Inc., St. Cloud, MN  Form RE-DT-CA 3/11/2004
VMP® -C165(CA) (0403)

**THOMPSON 0601**

**15113**

**29. OTHER TERMS.** If checked, the following are applicable to this Security Instrument:

[X] **Line of Credit.** The Secured Debt includes a revolving line of credit provision. Although the Secured Debt may be reduced to a zero balance, this Security Instrument will remain in effect until released.

[ ] **Construction Loan.** This Security Instrument secures an obligation incurred for the construction of an improvement on the Property.

[ ] **Fixture Filing.** Trustor grants to Lender a security interest in all goods that Trustor owns now or in the future and that are or will become fixtures related to the Property. This Security Instrument suffices as a financing statement and any carbon, photographic or other reproduction may be filed of record for purposes of Article 9 of the Uniform Commercial Code.

[ ] **Riders.** The covenants and agreements of each of the riders checked below are incorporated into and supplement and amend the terms of this Security Instrument. [Check all applicable boxes]

[ ] Condominium Rider    [ ] Planned Unit Development Rider    [ ] Other _____

[ ] **Additional Terms.**

**SIGNATURES:** By signing below, Trustor agrees to the terms and covenants contained in this Security Instrument and in any attachments. Trustor also acknowledges receipt of a copy of this Security Instrument on the date stated on page 1.

_____   7-6-06        _____
(Signature) **Sam Kholi**          (Date)       (Signature)                  (Date)

**ACKNOWLEDGMENT:**
(Individual) STATE OF _California_ , COUNTY OF _San Diego_ } ss.
On this _6_ day of _July 2006_ before me _Patti J. Mortweet_
a notary public, personally appeared _Sam Kholi_
~~personally known to me (~~or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the
entity upon behalf of which the person(s) acted, executed the instrument.
WITNESS my hand and official seal.

> PATTI J. MORTWEET
> Commission # 1428757
> Notary Public - California
> San Diego County
> My Comm. Expires Jul 4, 2007
> (Seal)

Signature _Patti J Mortweet_

Name (typed or printed)
_Patti J. Mortweet_

My commission expires: _July 4, 2007_

---

**REQUEST FOR FULL RECONVEYANCE**

To Trustee:

The undersigned is the holder of the note or notes secured by this Deed of Trust, which was recorded in the office of the Recorder of _____ County, State of California, in book _____ , page _____ of official records. Said note or notes, together with all other indebtedness secured by this Deed of Trust, have been paid in full. You are hereby directed to cancel said note or notes and this Deed of Trust, which are delivered hereby, and to reconvey, without warranty, all the estate now held by you under this Deed of Trust to the person or persons legally entitled thereto.

Dated: _____

Assessor's Identification Number _____ - _____ - _____

7000000205
(page 6 of 6)

Express © 1994 Bankers Systems, Inc., St. Cloud, MN Form RE-DT-CA 3/11/2004
VMP -C165(CA) (0403)

**THOMPSON 0602**

# EXHIBIT A

**15114**

LOT 20 OF SUN GOLD POINT, IN THE CITY OF SAN DIEGO, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 3216, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, APRIL 14, 1955.

EXCEPTING THEREFROM ANY PORTION THEREOF NOW OR HERETOFORE LYING BELOW THE MEAN HIGH TIDE LINE OF THE PACIFIC OCEAN.

**THOMPSON 0603**



RECORDING REQUESTED BY
ADVANTAGE TITLE INC.

RECORDING REQUESTED BY:

**558**

DOC # 2007-0408003

JUN 18, 2007    8:00 AM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
GREGORY J. SMITH, COUNTY RECORDER
FEES:        30.00
PAGES:          8         DA:        1

AFTER RECORDING MAIL TO:
Pacific Trust Bank
P.O. Box 5227
Chula Vista, CA 91910

*LOAN NO. 7500000003*

87680-21

[Space Above This Line For Recording Data]

2007-0408003

# DEED OF TRUST

THIS DEED OF TRUST ("Security Instrument") is made on **May 25, 2007.**
The trustor is **Sam Kholi, an Unmarried Man, as to Parcels 1 and 3 ;**
**Sam Kholi Enterprises, Inc., a California Corporation, as to Parcels 2 and 4** ("Borrower").

The trustee is **Advantage Title Inc.** ("Trustee").
The beneficiary is **Pacific Trust Bank** which is organized and existing under the laws of the United States of America, and whose address is P.O. Box 5227, Chula Vista, CA 91912 ("Lender").

Borrower owes Lender the principal sum of **THREE MILLION FIVE HUNDRED THOUSAND** dollars (U.S. **$3,500,000.00**). This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for monthly payments with the full debt, if not paid earlier, due and payable on **June 01, 2012.** This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in San Diego County, California:

*SEE LEGAL DESCRIPTION SCHEDULE "A" ATTACHED HERETO AND MADE A PART HEREOF.*

APN Numbers: 415-031-06-00 (Parcel 1) ; 441-530-62-00 (Parcel 2) ; 423-093-03-00 (Parcel 3) ; 424-572-05-00 (Parcel 4)

which have the following addresses:

**301 Sea Ridge Drive, La Jolla, CA 92037 (Parcel 1);**
**3650 Hancock Street, San Diego, CA 92110 (Parcel 2);**
**1525-1529 Garnet Avenue, San Diego, CA 92109 (Parcel 3);**
**4626 Albuquerque Street, San Diego, CA 92109 (Parcel 4)** ("Subject Property")

**NOTICE TO BORROWER: THE NOTE SECURED BY THIS DEED OF TRUST MAY CONTAIN PROVISIONS FOR A VARIABLE INTEREST RATE.**

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property".

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

*This debt is additional security for Commercial Loan made to* <u>*Sam Kholi Enterprises, Inc.*</u> *in connection with Commercial Promissory Note dated May 25, 2007 in the amount of THREE MILLION FIVE HUNDRED THOUSAND dollars (U.S. $ 3,500,000.00) which provides for interest payment and the full debt, if not paid earlier, due and payable on June 01, 2012.*

CALIFORNIA-CROSS-LIEN DEED-PACIFIC TRUST BANK

THOMPSON 0604

**559**

*LOAN NO. 7500000003*

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2. **Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender shall be applied: first, to interest due; second, to principal due; and last, to any late charges due under the Note.

3. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations on time and directly to the person owed payment. Borrower shall promptly furnish Lender receipts evidencing payments.

    Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

4. **Hazard or Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 6.

    All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

    Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer with in 30 days of notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due.

    The 30-day period will begin when the notice is given.

    Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraph 1 or change the amount of the payments. If under paragraph 19 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

**560**

*LOAN NO. 7500000003*

5.  **Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish and use the property as Borrowers principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage, or impair the Property, allow the Property to deteriorate, or commit waste on the Property, Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 16, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence.

6.  **Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorney's fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 6, Lender does not have to do so.

    Any amounts disbursed by Lender under this paragraph 6 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

7.  **Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

8.  **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

    In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

**THOMPSON 0606**

**561**

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds shall not extend or postpone the due date of the monthly payments referred to in paragraph 1 or change the amount of such payments.

9. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

10. **Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 15. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

11. **Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to the Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

12. **Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

13. **Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

14. **Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**THOMPSON 0607**

**562**

*LOAN NO. 7500000003*

15. **Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

    If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

16. **Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument, those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument; including, but not limited to, reasonable attorney's fees; and (d) takes such action as Lender may reasonably require at assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 15.

17. **Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 12 above and applicable law. The notice will state the name and address of the now Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law.

18. **Hazardous substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release or any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

    Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

    As used in this paragraph 18, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 18, "Environmental Law" means federal laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

**THOMPSON 0608**

**563**

*LOAN NO. 7500000003*

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

19. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraph 15 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 19, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

   If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of ;the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by applicable law to Borrower and to the other persons prescribed by applicable law. Trustee shall give public notice of sale to the persons and in the manner prescribed by applicable law. After the time required by applicable law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines, Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

   Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the trust of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

20. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty and without charge to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs.

21. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by applicable law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

22. **Request for Notices.** Borrower requests that copies of the notices of default and sale be sent to Borrower's address which is the Property Address.

23. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**564**

*LOAN NO. 7500000003*

24. **Waiver of Right of Revocation**: Third Party Trustor(s) hereby waives and relinquishes any right of revocation as provided in California Civil Code Section 2815.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

BORROWER(S) as to Parcels 1 and 3:

X_____
Sam Kholi

BORROWER(S) as to Parcels 2 and 4:

SAM KHOLI ENTERPRISES, INC., a California Corporation

X_____
Sam Kholi, President of Sam Kholi Enterprises, Inc.

_____

State of ___CA___

*County of* __San Diego__

On _June 5, 2007_ *before me,* _Brook Sheehan_____, *a Notary Public*
Personally appeared ____Sam Kholi_____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

*WITNESS my hand and official seal.*

*Brook Sheehan*  (Seal)

BROOK SHEEHAN
Commission # 1719146
Notary Public - California
San Diego County
My Comm. Expires Jan 21, 2011

CALIFORNIA-CROSS-LIEN DEED-PACIFIC TRUST BANK

**THOMPSON 0610**

**565**

SCHEDULE A

~~EXHIBIT "A"~~

The land referred to in this report is situated in the County of San Diego, State of California, and is described as follows:

Parcel 1:

Lot 20 of Sun Gold Point, in the City of San Diego, County of San Diego, State of California, according to Map thereof No. 3216, filed in the Office of the County Recorder of San Diego County, April 14, 1955; excepting therefrom any portion thereof now or heretofore lying below the mean tide line of the Pacific Ocean.

Parcel 2:

Lots 15 and 16 of Pickett Industrial Center Subdivision, in the City of San Diego, County of San Diego, State of California, according to the Map thereof No. 6709, filed in the Office of the County Recorder of San Diego County August 19, 1970.

Parcel 3:

Lot 6, 7 and 8 in Block 218 of Pacific Beach; in the City of San Diego, County of San Diego, State of California, according to map thereof no. 854 and 791, filed in the office of the County Recorder of San Diego County, September 28, 1898 and December 29, 1894, respectively.

Parcel 4:

That portion of Lots 2 and 4, Block 1, Homeland Villas in the City of San Diego, County of San Diego, State of California, according to Map thereof No. 1010, filed in the Office of the County Recorder of San Diego County, October 9, 1906, described as follows:

Beginning at the Northwesterly corner of said Lot 4; thence along the Northwesterly line of said Lot 4, North 62° 26' 45" East, 51.22 feet to the True Point of Beginning; thence North 14° 37' 05" West, 30.92 feet; thence North 62° 33' 25" East, 50.00 feet to a point in the Northeasterly line of said Lot 2; thence South 27° 26' 35" East along the Northeasterly line of said Lots, 90.00 feet; thence South 62° 33' 25" West, 70.49 feet; thence North 14° 37' 05" West, 61.38 feet to the True Point of Beginning.

THOMPSON 0611

**Tom Thompson**

| | |
|---|---|
| **From:** | Jon Lacey [jon@laceyland.com] |
| **Sent:** | Wednesday, January 23, 2008 1:00 PM |
| **To:** | 'Tom Thompson' |
| **Cc:** | sam@payrolling.com |
| **Subject:** | Kholi Trucking Enterprise |
| **Categories:** | Deal Making & legal |

Dear Tom,

By this letter, I am hoping to provide you details that we can generate a promissory note and security agreement.

Because of your repeated desire to secure a first position lien on real property, and because of the fact that Sam really wants to finish this deal as much as you do, please consider the following:

Sam currently has 4 first trust deeds on properties in security for promissory notes owed to Sam Kholi. As we discussed on the phone,

Trust Deed #1 is on a house in La Jolla and secures the principal sum of $1,360,000.
Trust Deed #2 is on a restaurant in Mission Beach, and I believe secures the principal sum of $700,000.00. ( I was not involved in that trust deed, so I am gathering the paper)
Trust Deed #3 is on a Palm Springs hotel and secures the principal sum of $1,540,000.00
Trust Deed #4 is on another Palm Springs hotel and secures the principal sum of $669,000.00

I will send you copies of the info on these loans by express mail delivery. These loans are interest only payments, and the principal amounts are fully secured by first trust deeds in favor of Sam.

It is imperative that you pre-agree to release your security interest in any of these loans within five (5) days of request, or by pre-lien releases. If for some reason you refuse to cooperate, such an act would be in default of the agreement, and you would lose the balance owed on the Kholi promissory note to you.

The Palm Springs properties are in states of foreclosure, and when we are able to close escrow, we will need to release our liens. Sam shall pledge that he shall transfer these funds into another first trust deed situation within 60-90 days. We can give you a security interest by agreement in said proceeds until a new first trust deed situation is enacted.

Again, these notes are being offered because you decline to accept anything less than a first position on any property. The total sum of the above described notes is $4,269,000.
Even discounted, these notes and deeds provide more than 20% above promissory note security as you desire, and agree and Sam agrees to. Even if we are able to get the funds from one or both of the hotels, you are still secure by the other properties, and the note will continue to reduce over time.

Of course, all of these items represent security interests, and are of no concern, unless Sam should default, which is not going to happen.

Sam will pay the additional sum down of $600,000.00.
Of the sales price of $3,600,000 Sam will have paid   $630,000   10-12-07
                                                        $600,000   new down by 1-31-08
                                                        $  83,330   payments on note
                                                       $1,313,330 paid

Leaving a balance of $2,286,670 on the new note.

THOMPSON 0641 
DEFENDANT'S EXHIBIT
D-45

I believe this structure will provide security for your family.

As for the medical issue, but I was thinking that some portion of his payment to you over the life of the note could be designated as a consulting fee constituting employment. In this way, you can be considered an employee and receive medical coverage for the life of the note, after which you could afford to be self insured.  You could write a brief of ideas on a weekly basis for Sam to consider, and that could constitute work product. Let me know what you think.

I can quickly prepare a promissory note, security agreement, consulting agreement reflecting the above numbers. Perhaps we need to amend the purchase agreement as well to reflect the new understanding.

Jon Lacey

EXHIBIT "A-2"

DOC # 2009-0504079

SEP 09, 2009   12:22 PM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
DAVID L. BUTLER, COUNTY RECORDER
FEES:        16.00
OC:            OC

PAGES:      2

Recording Requested By:

SAMER KHOULI

When Recorded Mail To:

SAMER KHOULI
4626 ALBUQUERQUE STREET
SAN DIEGO, CALIFORNIA 92109

8395

Space Above This Line Reserved for
Recorders Use

Assessor's Property Tax Parcel/Account Number: **424-572-05-00**

## QUITCLAIM DEED
(Corporation to Individual)

DOCUMENTARY TRANSFER TAX $_____ Ø GIFT

**KNOW ALL MEN BY THESE PRESENTS THAT:**

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which is hereby acknowledged, **SAM KHOLI ENTERPRISES, INC.,** an Corporation organized under the laws of the State of California, hereinafter referred to as "Grantor", does hereby remise, release, and forever quitclaim unto **SAMER KHOULI**, a single man, hereinafter "Grantee", the following lands and property, together with all improvements located thereon, lying in the County of Riverside, State of California, to-wit:

ALL THAT CERTAIN REAL PROPERTY SITUATED IN THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, DESCRIBED AS FOLLOWS:

THAT PORTION OF LOTS 2 AND 4, BLOCK 1, HOMELAND VILLAS, IN THE CITY OF SAN DIEGO, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO 1010, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, OCTOBER 9, 1906, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWESTERLY CORNER OF SAID LOT 4; THENCE ALONG THE NORTHWESTERLY LINE OF SAID LOT 4, NORTH 62*26'45" EAST, 51.22 FEET TO THE TRUE POINT OF BEGINNING; THENCE NORTH 14*37'05" WEST, 30.92 FEET; THENCE NORTH 62*33'25" EAST, 50.00 FEET TO A POINT IN THE NORTHEASTERLY LINE OF SAID LOT 2; THENCE SOUTH 27*26'35" EAST ALONG THE NORTHEASTERLY LINE OF SAID LOTS, 90.00

- Quitclaim Deed - 1

8396

FEET; THENCE SOUTH 62*33'25" WEST, 70.49 FEET; THENCE NORTH 14*37'05" WEST, 61.38 FEET TO THE TRUE POINT OF BEGINNING.

Commonly known as: 4626 ALBUQUERQUE STREET, SAN DIEGO, CALIFORNIA 92109.

SUBJECT to all easements, rights-of-way, protective covenants and mineral reservations of record, if any.

TO HAVE AND TO HOLD same unto Grantee, and unto Grantee's heirs and assigns forever, with all appurtenances thereunto belonging.

The property herein conveyed is not a part of the homestead of Grantor.

WITNESS Grantor(s) hand(s) this the 19th day of June, 2009.

SAM KHOLI ENTERPRISES, INC.

By: SAM KHOLI
President

State of California
County of SAN DIEGO

On __July 09, 2009__ before me, __Tiffany Henning, Notary Public__ (here insert name and title of the officer), personally appeared, SAM KHOLI, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____



- Quitclaim Deed - 2

EXHIBIT "A-3"

California Business Search                                    Page 1 of 1

# California Business Portal
### Secretary of State DEBRA BOWEN

**DISCLAIMER:** The information displayed here is current as of DEC 11, 2009 and is updated weekly. It is not a complete or certified record of the Corporation.

| Corporation | | |
| --- | --- | --- |
| PAYROLLING.COM | | |
| **Number:** C2128061 | **Date Filed:** 12/17/1998 | **Status:** suspended |
| **Jurisdiction:** California | | |
| Address | | |
| 4626 ALBUQUERQUE ST | | |
| SAN DIEGO, CA 92109 | | |
| Agent for Service of Process | | |
| PIERRE EL-KHAOULI | | |
| 8333 CLAIREMONT MESA BLVD #109 | | |
| SAN DIEGO, CA 92111 | | |

Blank fields indicate the information is not contained in the computer file.

If the status of the corporation is "Surrender", the agent for service of process is automatically revoked. Please refer to California Corporations Code Section 2114 for information relating to service upon corporations that have surrendered.

# California Business Portal

## Secretary of State DEBRA BOWEN

**DISCLAIMER:** The information displayed here is current as of DEC 11, 2009 and is updated weekly. It is not a complete or certified record of the Corporation.

| Corporation | | |
|---|---|---|
| PAYROLLING.COM CORP. | | |
| **Number:** C3129371 | **Date Filed:** 9/10/2008 | **Status:** active |
| **Jurisdiction:** California | | |
| **Address** | | |
| 4626 ALBUQUERQUE ST | | |
| SAN DIEGO, CA 92109 | | |
| **Agent for Service of Process** | | |
| PIERRE EL KHAOULI | | |
| 4626 ALBUQUERQUE ST | | |
| SAN DIEGO, CA 92109 | | |

Blank fields indicate the information is not contained in the computer file.

If the status of the corporation is "Surrender", the agent for service of process is automatically revoked. Please refer to California Corporations Code Section 2114 for information relating to service upon corporations that have surrendered.

EXHIBIT "B"

# In The Matter Of:

*Sam Kholi Enterprises, Inc. v.*
*Tom R. Thompson d/b/a Thompson Trucking*

---

*Sam Kholi Enterprises, Inc. and Sam Kholi*
*September 24, 2008*

---

*Waco Court Reporters, P.C.*
*P.O. Box 5365*
*Waco, Texas  76708-5365*
*254/753-8001*
*wcr@hot.rr.com*

Original File SK092408.txt, Pages 1-148

**Word Index included with this Min-U-Script®**

This Page Intentionally Left Blank

Sam Kholi Enterprises, Inc. v.
Tom R. Thompson d/b/a Thompson Trucking

Sam Kholi Enterprises, Inc. and Sam Kholi
September 24, 2008



---

**Page 1**

[1]              IN THE UNITED STATES DISTRICT COURT
[2]               FOR THE WESTERN DISTRICT OF TEXAS
                        WACO DIVISION
[3] SAM KHOLI ENTERPRISES, INC.  §
                                 §
[4] VS.                          §          CIVIL ACTION
                                 §          NO. W-08-CA-105
[5] TOM R. THOMPSON D/B/A        §
    THOMPSON TRUCKING            §
[6] --------------------------------------------------
[7]        ORAL AND VIDEOTAPED DEPOSITION OF
[8]     SAM KHOLI ENTERPRISES, INC. AND SAM KHOLI
[9]                SEPTEMBER 24, 2008
[10]                 VOLUME 1 OF 1
[11] --------------------------------------------------
[12]
[13]
[14]
[15]
[16]      ORAL   AND   VIDEOTAPED   DEPOSITION OF SAM KHOLI
[17] ENTERPRISES, INC. AND SAM KHOLI, produced as a witness
[18] duly sworn by me at the instance of the Defendant, taken
[19] in the above styled and numbered cause on September 24,
[20] 2008, from 9:34 a.m. to 2:59 p.m., before Joe L. Crews,
[21] Certified Shorthand Reporter No. 204 in and for the State
[22] of Texas, at the offices of Naman, Howell, Smith & Lee,
[23] L.L.P., located at 900 Washington Avenue, 7th Floor,
[24] Waco, Texas, pursuant to the Federal Rules of Civil
[25] Procedure and the provisions stated on the record.

---

**Page 2**

[1]              A P P E A R A N C E S
[2] FOR THE PLAINTIFF
        JEFFREY A. ARMSTRONG
[3]     NAMAN, HOWELL, SMITH & LEE, L.L.P.
        900 Washington Avenue, Suite 700
[4]     P. O. Box 1470
        Waco, Texas  76703-1470
[5]     Phone:  254/755-4100
[6] FOR THE DEFENDANT
        JACK R. CREWS
[7]     BAIRD, CREWS, SCHILLER & WHITAKER, P.C.
        15 North Main Street
[8]     Temple, Texas  76501-7629
        Phone:  254/774-8333
[9]
    ALSO PRESENT
[10]    Tom R. Thompson
        Jon Lacey
[11]    Vlad Bouma, Videographer
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]    Proceedings reported by Computerized Stenotype
[24] Machine; Reporter's record produced by Computer-Assisted
[25] Transcription.

---

**Page 3**

[1]                        INDEX
[2]                                                    PAGE
       Appearances ------------------------------------    2
[3]
    SAM KHOLI ENTERPRISES, INC. AND SAM KHOLI
[4]    Direct Examination By Mr. Crews -------------    4
       Cross-Examination By M ---------------------- 136
[5]    Redirect Examination By Mr. Crews ----------- 143
[6] Witness's Signature Page Corrections ------------- 144
[7]
[8]
[9]
[10]                      EXHIBITS
    NUMBER DESCRIPTION
[11]                                                   Page
     1    10-12-07 Agreement For The Purchase and Sale
[12]       of Business ------------------------------   30
     2    10-12-07 Agreement For The Purchase and Sale
[13]       of Business ------------------------------   34
[14] 3    10-12-08 Fax From Mr. Thompson To Nina ------- 38
[15] 4    9-7-07 E-Mail From Mr. Thompson To Mr. Kholi - 41
[16] 5    10-12-07 E-Mail From Mr. Thompson To Mr. Kholi 56
[17] 6    10-12-07 E-Mail From Mr. Thompson To Mr. Kholi 59
[18] 7    10-13-08 Fax From Mr. Thompson To Mr. Kholi -- 63
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

**Page 4**

[1]    SAM KHOLI ENTERPRISES, INC. AND SAM KHOLI,
[2] having been first duly sworn, testified as follows:
[3]             DIRECT EXAMINATION
[4] QUESTIONS BY MR. CREWS:
[5]    Q. Good morning, Mr. Kholi. My name is Jack
[6] Crews. I represent Tom Thompson in this matter. For the
[7] record, would you state your full name and where you do
[8] business?
[9]    A. Sam Kholi, and I do business in San Diego,
[10] California.
[11]    Q. Have you ever had your deposition taken before?
[12]    A. Yes.
[13]    Q. How many times, about?
[14]    A. Probably five or 10.
[15]    Q. Okay. Gosh, let's go off the record just a
[16] second and let me turn off my cell phone.
[17]       (Discussion off the record 9:35 to 9:36)
[18]       I sure apologize for my cell phone. It
[19] shouldn't go off anymore.
[20]    A. No problem, sir.
[21]    Q. You've had your deposition taken five or 10
[22] times?
[23]    A. Yes.
[24]    Q. Okay. When was about the last time you had
[25] your deposition taken?

---

Sam Kholi Enterprises, Inc. and Sam Kholi
September 24, 2008

Sam Kholi Enterprises, Inc. v.
Tom R. Thompson d/b/a Thompson Trucking

Page 5

[1]    **A.**  A couple of years ago.

[2]    **Q.**  Were all the cases business related?  Were they

[3]  about business deals?

[4]    **A.**  Yes.

[5]    **Q.**  Okay.  You'll quickly find out that I sometimes

[6]  ask questions clumsily.  If I do in this case, and I

[7]  probably will, just let me know that you don't understand

[8]  the question and I'll stop and try to rephrase it.  Okay?

[9]    **A.**  Okay.

[10]    **Q.**  If you need a break, just let me know and we'll

[11]  sure take one anytime you want one.  Okay?

[12]    **A.**  Okay.

[13]    **Q.**  All right.  What do you do for a living?

[14]    **A.**  Business owner.

[15]    **Q.**  I'm sorry?

[16]    **A.**  Business owner.

[17]    **Q.**  Okay.  And you're here today as the

[18]  representative of Kholi Enterprises, Inc., correct?

[19]    **A.**  Sam Kholi Enterprises, Inc.

[20]    **Q.**  Sam Kholi Enterprises, Inc.  And also in your

[21]  individual capacity.  Do you understand that?  You're

[22]  kind of -- You're representing your company and here on

[23]  behalf of yourself.

[24]    **A.**  Yes.

[25]    **Q.**  Okay.  Now, what kind of business owner are

Page 6

[1]  you?  What is your business?

[2]    **A.**  I have a trucking company and I have a staffing

[3]  company.

[4]    **Q.**  All right.  Now, the trucking company has --

[5]  Is it Sam Kholi Enterprises, Inc.?

[6]    **A.**  Yes.

[7]    **Q.**  That's how -- that's -- that company operates

[8]  your trucking company?

[9]    **A.**  Yes.

[10]    **Q.**  Are there any other shareholders of Sam Kholi

[11]  Enterprises, Inc. besides you?

[12]    **A.**  No.

[13]    **Q.**  Any other directors besides you?

[14]    **A.**  No.

[15]    **Q.**  Any other officers besides you?

[16]    **A.**  No.

[17]    **Q.**  How many employees does Sam Kholi Enterprises,

[18]  Inc. have right now?

[19]    **A.**  I don't know.

[20]    **Q.**  You don't know?

[21]    **A.**  No.

[22]    **Q.**  Well, that's -- that's an unusual response.  Is

[23]  it -- Can you put -- can you quantify it in any way?

[24]  Less than 10, more than 10?

[25]    **A.**  A lot more than 10, yeah.

Page 7

[1]    **Q.**  Well, can you --  Is it more than 100?

[2]    **A.**  Yeah.

[3]    **Q.**  Is it more than 200?

[4]    **A.**  Yeah.

[5]    **Q.**  Okay.  Is it more than 500?

[6]    **A.**  Yeah.

[7]    **Q.**  Is it more than a thousand?

[8]    **A.**  Yeah.

[9]    **Q.**  You have more than a thousand employees?

[10]    **A.**  Yes.

[11]    **Q.**  In Sam Kholi Enterprises, Inc.?

[12]    **A.**  Yes.

[13]    **Q.**  Is it -- Do you have more than --  Is it more

[14]  than 2 thousand?

[15]    **A.**  Yes.

[16]    **Q.**  Okay.  Is it more than 5 thousand?

[17]    **A.**  I don't know.

[18]    **Q.**  Okay.  We've narrowed it between -- somewhere

[19]  between 2 thousand and 5 thousand employees?

[20]    **A.**  Yes.

[21]    **MR. ARMSTRONG:**  Objection, form.

[22]    **MR. CREWS:**  What's the objection?

[23]    **MR. ARMSTRONG:**  He said he didn't know if

[24]  it was more than 5 thousand, so I wouldn't say it was

[25]  between 2 thousand and 5 thousand.



Page 8

[1]  **BY MR. CREWS:**

[2]    **Q.**  Okay.  Do you think it's more than 5

[3]  thousand?

[4]    **A.**  No, I don't know.

[5]    **Q.**  You don't know?  Well, do you think it's more

[6]  than 10 thousand?

[7]    **A.**  No.  It's --  I don't know.

[8]    **Q.**  What is your --  How often does your company

[9]  pay these employees?  Is it every two weeks, every

[10]  week?

[11]    **A.**  Some of them every week, some of them every two

[12]  weeks, some of them every month.

[13]    **Q.**  About what does the monthly payroll run for Sam

[14]  Kholi Enterprises, Inc.?

[15]    **A.**  Probably about 9 million.

[16]    **Q.**  $9 million per month, about?

[17]    **A.**  Approximately.

[18]    **Q.**  And just so I can get as good a number as we

[19]  can get today about the number of employees, did I

[20]  understand you to say that it's probably more than 5

[21]  thousand but not as much as 10 thousand employees?

[22]    **A.**  I said I don't know if it's --  I said probably

[23]  less than -- a little bit less than 5 thousand.

[24]    **Q.**  A little bit less?

[25]    **A.**  It could be a little bit more too.  I --  The



Sam Kholi Enterprises, Inc. v.
Tom R. Thompson d/b/a Thompson Trucking

Sam Kholi Enterprises, Inc. and Sam Kholi
September 24, 2008

Page 9

[1] counts fluctuate.
[2]     Q.  How would you classify most of your employees?
[3] Are they truck drivers?
[4]     A.  No.  No.  Most of them are clerical capacities,
[5] programmers, engineers, scientists, accounting people.
[6]     Q.  In Sam Kholi Enterprises, Inc.?
[7]     A.  Yes.
[8]     Q.  Does Sam Kholi Enterprises, Inc. do more than
[9] trucking?
[10]     A.  Yes.
[11]     Q.  Okay.  What kinds of businesses is it in?
[12]     A.  It's a staffing company.
[13]     Q.  Okay.  Well, maybe that's my -- that's my
[14] problem.  I understood that you had a staffing company
[15] and a trucking company.  Am I incorrect on that?  Is it
[16] all one company?
[17]     A.  It's all one company, yes.
[18]     Q.  Okay.  And it all operates out of Sam -- or
[19] under the business entity of Sam Kholi Enterprises, Inc.?
[20]     A.  Yes.
[21]     Q.  Now, the staffing company -- so the staffing
[22] company and the trucking company all operate out of that
[23] one entity.  Correct?
[24]     A.  Yes.
[25]     Q.  How many employees do you have that are devoted

Page 10

[1] to the trucking aspect of your company?
[2]     A.  Approximately 60, 65.
[3]     Q.  And the rest, on up to whatever the number is,
[4] 5 thousand, more or less, is devoted to the staffing
[5] company?
[6]     A.  Yes.
[7]     Q.  And there are programmers -- computer
[8] programmers?
[9]     A.  Yes.
[10]     Q.  And engineers?
[11]     A.  Yes.
[12]     Q.  Are -- Do they all work for the staffing
[13] company?  Or does the staffing company provide employees
[14] for other businesses?
[15]     A.  We provide employees to other clients, other
[16] companies.
[17]     Q.  And the gross payroll monthly for all of Sam
[18] Kholi Enterprises, Inc. is about $9 million a month?
[19]     A.  Approximately, yeah.
[20]     Q.  How -- What would you estimate the net worth
[21] of Sam Kholi Enterprises to be?
[22]     A.  I don't know.
[23]     Q.  Do you -- Does the company provide any
[24] financial statements to, like, banks, or any kind of
[25] financial institutions?

Page 11

[1]     A.  No.
[2]     Q.  Who maintains the books and records of Sam
[3] Kholi Enterprises, Inc.?
[4]     A.  I do.
[5]     Q.  You do the accounting?
[6]     A.  I have people helping me, but I overlook the
[7] accounting.
[8]     Q.  Do you generate monthly or quarterly financial
[9] statements?  I say "you."  Does Sam Kholi Enterprises
[10] generate monthly or quarterly financial statements?
[11]     A.  On an as-needed basis.
[12]     Q.  On an as-needed basis?
[13]     A.  Yes.
[14]     Q.  How many times, say, in the last year have
[15] you -- has the company needed to generate financial
[16] statements?
[17]     A.  I don't recall how many.
[18]     Q.  You don't know?
[19]     A.  Huh-uh.
[20]     Q.  Was it more than one?
[21]     A.  Yeah.  More than one.
[22]     Q.  Does it --  And I imagine that it files regular
[23] 941 statements with the Internal Revenue Service.
[24]     A.  Yes.
[25]     Q.  And it issues payroll checks?

Page 12

[1]     A.  Yes.
[2]     Q.  To employees?
[3]     A.  Yes.
[4]     Q.  Now, with the staffing company, with the many
[5] employees that it has, you have those employees, and then
[6] you have the trucking aspect, I'll call it, of Sam Kholi
[7] Enterprises, Inc., and it has about 65 employees.  Did I
[8] recall your testimony correctly?
[9]     A.  Approximately 65.
[10]     Q.  Approximately 65.  Of those 65 employees, what
[11] do most of them do?  Are they truck drivers?
[12]     A.  Most of them are truck drivers.
[13]     Q.  How many --  About how many employees do you
[14] have that are working in the trucking aspect of your
[15] business that are not truck drivers?
[16]     A.  Seven or eight or nine.
[17]     Q.  What do they do?
[18]     A.  Administrative works, and then a couple of
[19] mechanics.
[20]     Q.  Mechanics who work on the trucks?
[21]     A.  Yes.
[22]     Q.  How many trucks --  Does your company actually
[23] own the trucks that it runs?
[24]     A.  We have a few owner/operators, but mostly, yes,
[25] company trucks.



Page 13

[1]   **Q.** Does it -- About how many trucks does it own?
[2]   **A.** I don't know. Between 55 and 65.
[3]   **Q.** How many -- how many trailers?
[4]   **A.** Between 110 and 130.
[5]   **Q.** Now, does -- your trucking business, is it
[6]  nationwide? Does it deliver nationwide? Or is it
[7]  confined to a particular region of the country?
[8]   **A.** We're nationwide.
[9]   **Q.** Now, how long has Sam Kholi Enterprises, your
[10] company, been in existence?
[11]  **A.** Repeat that question.
[12]  **Q.** Yes, sir. The company, Sam Kholi Enterprises,
[13] Inc., how long has it been in existence?
[14]  **A.** Approximately since '97.
[15]  **Q.** How long has it been in the trucking business?
[16]  **A.** About 15, 16 months.
[17]  **Q.** What -- And so has it always been a staffing
[18] company until it also started doing trucking business?
[19]  **A.** Yes. Uh-huh.
[20]  **Q.** What -- And you made the decision to get into
[21] the trucking business?
[22]  **A.** Yes.
[23]  **Q.** Is that correct?
[24]  **A.** (Moving head up and down).
[25]  **Q.** What caused you to get into the trucking

Page 14

[1]  business? What was it about the business that you wanted
[2]  to participate in?
[3]   **A.** It's mostly advertising -- advertising
[4]  business. It says on all my trailers, "Jesus Christ is
[5]  Lord not a swear word." So that's why I try to get into
[6]  the business.
[7]   **Q.** I noticed you've got that on your shirt also,
[8]  that saying, "Jesus Christ is Lord not a swear word."
[9]   **A.** Yes.
[10]  **Q.** Okay. Is that, like -- Is it a motto of your
[11] company? Or how would you characterize that? I think
[12] I've seen your trucks -- or some of the trucks or
[13] trailers that has that on I-35.
[14]  **A.** All right.
[15]  **Q.** So is that -- How would -- Would you
[16] characterize that as a motto, or -- I don't want to put
[17] words in your mouth. Or is it a trademark of your
[18] business? Why do you have them on the sides of your,
[19] guess, trailers?
[20]  **A.** Allow people to know Jesus Christ is Lord and
[21] not a swear word.
[22]  **Q.** Okay. Did you get into it for any other reason
[23] other than advertising? The trucking business, I mean.
[24]  **A.** That was the main reason I started the trucking
[25] business.

Page 15

[1]   **Q.** Most people start businesses in order to
[2]  generate profit. There's nothing wrong with that.
[3]  But -- And so I would ask you, did you intend to make
[4]  profits from the trucking business also?
[5]   **A.** Yes.
[6]   **Q.** Besides the payroll business and the trucking
[7]  business, do you -- are you involved in any other
[8]  categories of businesses?
[9]   **A.** Yes.
[10]  **Q.** Can you tell me what they are?
[11]  **A.** I do also lending and real estate.
[12]  **Q.** Anything else?
[13]  **A.** That's it.
[14]  **Q.** Is the lending that you do, is it for
[15] commercial type loans, or residential loans, or both? Or
[16] can you describe for me what the lending business is like
[17] for you?
[18]  **A.** Both.
[19]  **Q.** Do you own a bank?
[20]  **A.** No.
[21]  **Q.** Is your lending, then, a private lending
[22] company? A corporation set up to make loans?
[23]  **A.** It's under Sam Kholi Enterprises, Inc.
[24]  **Q.** It's also under Sam Kholi Enterprises --
[25]  **A.** Yes.

Page 16

[1]   **Q.** -- Inc.? Okay. Is it a large lending
[2]  component? I mean, by "large," is it -- Can you give me
[3]  an idea of how many loans you have outstanding, dollar
[4]  amount?
[5]   **A.** I don't know.
[6]   **Q.** Is there a person in your company who might
[7]  know that information?
[8]   **A.** No.
[9]   **Q.** Nobody would know?
[10]  **A.** No.
[11]  **Q.** Well, who makes the decisions about whether to
[12] loan money to a person or a business?
[13]  **A.** I do.
[14]  **Q.** And you don't know about how much you have
[15] loaned out through your company?
[16]  **A.** No.
[17]  **Q.** Is it more than a million or less than a
[18] million, do you think?
[19]  **A.** More than a million.
[20]  **Q.** Is it more than 10 million?
[21]  **A.** I don't know.
[22]  **Q.** Is it more than 5 million?
[23]  **A.** I have to go look through my records to find
[24] out how much.
[25]  **Q.** I don't want you to do that. I just wanted to

Sam Kholi Enterprises, Inc. v.
Tom R. Thompson d/b/a Thompson Trucking

Sam Kholi Enterprises, Inc. and Sam Kholi
September 24, 2008

Page 17

[1] get an idea of what -- as we sit here, what you thought
[2] you had loaned out to folks. More than a million, not
[3] more than 10 million. But can you tie it down any closer
[4] to a dollar figure than that?
[5]   A.   Probably between 5 and 10 million.
[6]   Q.   Do you have a law firm -- Well, let me back up
[7] and ask it this way. Are those loans that you make
[8] documented by promissory notes and security instruments?
[9]   A.   Yes.
[10]   Q.   And who primarily does that for you? What --
[11] I imagine it's going to be a law firm or a lawyer. Is it
[12] Mr. Lacey or somebody else?
[13]   A.   Generally it's Mr. Lacey.
[14]   Q.   All right. Do you have any employees that are
[15] devoted -- Or let me back up. Do you have any employees
[16] that participate in your company's lending business
[17] besides you?
[18]   A.   Yeah, I have one.
[19]   Q.   And is he or she in California?
[20]   A.   In California, yes.
[21]   Q.   How about the real estate business? Do you buy
[22] real estate, sell real estate? When you say you're in
[23] the real estate business, what do you mean?
[24]   A.   I buy and sell real estate, yes.
[25]   Q.   Do you buy and sell it in the California area,

Page 18

[1] or in the state of California, or in other states besides
[2] California?
[3]   A.   In the state of California right now.
[4]   Q.   Do you have a dollar figure in mind that you
[5] think your real estate portfolio is worth?
[6]   A.   I don't know.
[7]   Q.   Well, is it more than 5 million?
[8]   A.   Yes.
[9]   Q.   Do you think it's more than 10 million?
[10]   A.   Yes.
[11]   Q.   Do you think it's more than 15 million?
[12]   A.   I don't know.
[13]   Q.   And when I say its "worth," is that -- I was
[14] asking you too broad of a question. What do you think is
[15] the equity in the property? In other words, you've
[16] got -- all the properties together are valued at a
[17] certain amount, and there's probably going to be some
[18] debt against it, unless I'm just wrong. Is there any
[19] debt against -- Or does the real estate collateralize
[20] any loans?
[21]   A.   Yes.
[22]   Q.   Do you have an idea of what the net worth of
[23] those real properties are, in general terms?
[24]   A.   I can't give you a number on it.
[25]   Q.   Are those properties pledged as collateral to

Page 19

[1] any lenders other than your company?
[2]   A.   Yes.
[3]   Q.   Are they to commercial banks?
[4]   A.   Yes.
[5]   Q.   About how many -- Do you have an idea of how
[6] many separate properties that your company owns?
[7]   A.   Four.
[8]   Q.   Four properties?
[9]   A.   Uh-huh.
[10]   Q.   How many does it own -- Has it owned any more
[11] than four properties in the last year?
[12]   A.   Yes.
[13]   Q.   About how many?
[14]   A.   Five or six.
[15]   Q.   Are they different properties than what it owns
[16] now? Or did it own five or six, and these four that it
[17] owns now are part of that five or six?
[18]   A.   It owned five or six, we sold a couple, we
[19] bought another one.
[20]   Q.   Do you consider yourself to be a knowledgeable
[21] businessman?
[22]   A.   Yes.
[23]   Q.   Do you consider yourself knowledgeable in the
[24] area of purchasing other businesses?
[25]   A.   Yes.

Page 20

[1]   Q.   I'm -- We're going to get to the -- to talking
[2] about the transaction between your company and you and
[3] Mr. Thompson in a little bit. Was -- Have you
[4] participated in purchasing -- in the purchasing of
[5] businesses before you met Tom?
[6]   A.   Yes.
[7]   Q.   Round numbers, about how many businesses have
[8] you purchased prior to the time you met Tom?
[9]   A.   Two.
[10]   Q.   And what kind of businesses were they?
[11]   A.   Restaurants.
[12]   Q.   Did you form Sam Kholi Enterprises yourself, or
[13] did you buy it?
[14]   A.   I formed it myself.
[15]   Q.   And so it's had the same name all through its
[16] existence?
[17]   A.   Yes.
[18]   Q.   And you -- I -- My belief is or my
[19] understanding is that when you formed Sam Kholi
[20] Enterprises, Inc., did you -- my thinking is that you
[21] started the payroll business. Is that right or is that
[22] wrong?
[23]   A.   That's right.
[24]   Q.   So you started the payroll business and built
[25] it up over a period of years?



Sam Kholi Enterprises, Inc. and Sam Kholi
September 24, 2008

Sam Kholi Enterprises, Inc. v.
Tom R. Thompson d/b/a Thompson Trucking

Page 21

[1]   **A.**   Yes.

[2]   **Q.**   And that payroll business essentially does the

[3]   administrative work for other companies:  You provide

[4]   employees, and pay the payroll and -- your company does,

[5]   and do all the things that is necessary to have an

[6]   employee.  Is that correct?

[7]   **A.**   Yes.

[8]   **Q.**   So you provide a service to other businesses so

[9]   they can have employees but not have all the

[10]  administrative headaches that come with employees?  Is

[11]  that fair?

[12]  **A.**   Yes.

[13]  **Q.**   Is the payroll aspect of Sam Kholi Enterprises,

[14]  is it nationwide?

[15]  **A.**   Yes.

[16]  **Q.**   About how many business clients does it have?

[17]  **A.**   Between 150 and 200.

[18]  **Q.**   Do you -- or does your company negotiate with

[19]  businesses to set the prices for your services?

[20]  **A.**   Yes.

[21]  **Q.**   Those 150 or so -- 100, 150 customers, are they

[22]  in one particular type of business?  Are they -- Or are

[23]  they spread out over different industries and

[24]  professions?

[25]  **A.**   Different industries and professions.

Page 22

[1]   **Q.**   So your company, then, would have some

[2]   experience with dealing with -- would it be fair to say a

[3]   wide range of companies?

[4]   **A.**   Yes.

[5]   **Q.**   In providing employees?

[6]   **A.**   Yes.

[7]   **Q.**   Now, you told me that Sam Kholi Enterprises,

[8]   Inc. had been in the trucking business about -- Did you

[9]   say about 15 months?

[10]  **A.**   Yes.

[11]  **Q.**   15 months from today?  Going back 15 months?

[12]  **A.**   Approximately.

[13]  **Q.**   How did you come to talk to Tom Thompson?

[14]  **A.**   He was advertising an ad in a magazine -- truck

[15]  paper, magazine, for owner/operators.

[16]  **Q.**   For truck drivers?

[17]  **A.**   Yeah -- No, owner/operators.

[18]  **Q.**   Okay.  I'm sorry.  I -- What's the difference

[19]  between a truck driver and an owner/operator?

[20]  **A.**   A truck driver drive a truck, owner/operator

[21]  own a truck.

[22]  **Q.**   Was that ad for the owner/operators -- have

[23]  anything to do with him selling his business?

[24]  **A.**   No.

[25]  **Q.**   So you saw the name of his company in a

Page 23

[1]   trucking magazine, advertising for owner/operators?

[2]   **A.**   Yes.

[3]   **Q.**   What caused you -- Did you call him?

[4]   **A.**   I called the number and I spoke to one of the

[5]   people who answered the phone.

[6]   **Q.**   Now, my thinking is that you weren't looking

[7]   for a job as an owner/operator of a truck working for

[8]   Mr. Thompson.  That's speculation on my part.  But is

[9]   that -- Did you call -- You didn't call looking for a

[10]  job, did you?

[11]  **A.**   Yes.

[12]  **Q.**   For yourself?

[13]  **A.**   For my trucks.

[14]  **Q.**   Oh, for your trucks.  Okay.  Did you talk to --

[15]  Do you remember talking to Mr. Thompson on that -- the

[16]  first time that you called that number in the ad?

[17]  **A.**   No.  I talked to Debbie.

[18]  **Q.**   Is there anything significant that you remember

[19]  about that conversation with Debbie?

[20]  **A.**   The only significant thing I remember is the

[21]  way they answered the phone:  As Jones Motor Group.

[22]  **Q.**   Why is that significant to you?

[23]  **A.**   Because the ad stated Tom Thompson Trucking of

[24]  Texas, and then when I called the number, the phone

[25]  answered Jones Motor Group.  So I thought I had the wrong

Page 24

[1]   number.

[2]   **Q.**   Did that get cleared up?  Did you actually dial

[3]   the right number?

[4]   **A.**   Yes.  She told me it's the right number.

[5]   **Q.**   Did you ask why they were answering the phone

[6]   Jones Motor Group?

[7]   **A.**   No.

[8]   **Q.**   When did that information become significant to

[9]   you, answering as Jones Motor Group rather than Tom

[10]  Thompson Trucking?

[11]  **A.**   You need to be a little bit more specific about

[12]  your question.

[13]  **Q.**   Okay.  Why was that significant?

[14]  **A.**   The ad says Tom Thompson Trucking, the phone

[15]  answer says Jones Motor Group.  You're wondering what the

[16]  relationship is.

[17]  **Q.**   Did anyone ever explain that to you?

[18]  **A.**   With time, yes.

[19]  **Q.**   Were you satisfied with that explanation?

[20]  **A.**   Yes.

[21]  **Q.**   Who explained that relationship to you?

[22]  **A.**   I don't remember who explained it to me.

[23]  **Q.**   After that first conversation, what happened

[24]  next in relation to talking with Tom or employees of the

[25]  company -- of his company?

Sam Kholi Enterprises, Inc. v.
Tom R. Thompson d/b/a Thompson Trucking

Sam Kholi Enterprises, Inc. and Sam Kholi
September 24, 2008

Page 25

[1] **A.** I met with Tom. I talked to him about
[2] employing our trucks, dispatching our trucks.
[3] **Q.** Let me back up a moment. What kind of time
[4] frame are we dealing with on that first phone call? I
[5] know -- I'm pretty sure it was in the year 2007. Is
[6] that correct?
[7] **A.** Yes.
[8] **Q.** Do you have an idea of when you first called?
[9] What time of year?
[10] **A.** I don't remember.
[11] **Q.** Was it in the summer, or the spring, or the
[12] fall?
[13] **A.** Probably in the summer.
[14] **Q.** Do you have any sense of the time that elapsed
[15] between your first phone call, when you talked with
[16] Debbie, and then later when you talked with Tom?
[17] **A.** No.
[18] **Q.** You didn't talk with Tom on that initial phone
[19] call; you just talked with Debbie?
[20] **A.** Yes.
[21] **Q.** However long it was after that phone call, did
[22] Tom call you, you call Tom? Did you-all meet? Can you
[23] tell me about what the next contact was regarding this
[24] business?
[25] **A.** I don't know the exact detail, but I know I met

Page 27

[1] **Q.** Did you have any owner/operators in addition to
[2] those tractors?
[3] **A.** No.
[4] **Q.** So the first conversation you had with Tom, it
[5] focused on what services he could provide your company
[6] and how much it would cost, correct?
[7] **A.** Correct.
[8] **Q.** Did you -- did your company hire Tom's company
[9] to provide those services?
[10] **A.** I wouldn't say "hire." We did pull loads for
[11] Jones Motor Group.
[12] **Q.** Okay. Now, when -- With the term "pull
[13] loads," what do you mean by "pull loads"?
[14] **A.** Pull loads. Load the trucks. They loaded the
[15] trucks for us. That's what "pull loads."
[16] **Q.** Okay. So they would provide the -- By
[17] "pulling loads" you mean that the tractor-trailer is
[18] actually pulling a load down the road? That's what that
[19] means?
[20] **A.** Yeah. They provided the dispatching of the
[21] load, finding the loads, and directing our driver where
[22] to go.
[23] **Q.** Okay. Now, you mentioned Jones Motor Group.
[24] How did Jones Motor Group come into this business
[25] arrangement between your company and Tom's company?

Page 26

[1] with Tom for lunch.
[2] **Q.** Okay. So you met here in Texas?
[3] **A.** Yes.
[4] **Q.** And what do you remember about that first lunch
[5] meeting you had with Tom?
[6] **A.** I discussed what we're doing, and I was just
[7] asking him if he can dispatch our trucks, and how much he
[8] would pay us to move the trucks.
[9] **Q.** You were already -- or your company was already
[10] in the trucking business when you talked to Tom?
[11] **A.** Yes.
[12] **Q.** Did you -- So that first lunch you had with
[13] Tom, you kind of discussed the pricing of his services
[14] for your company? Is that fair?
[15] **A.** Yes.
[16] **Q.** Do you remember discussing anything else?
[17] **A.** I don't remember.
[18] **Q.** What kind of prices were discussed?
[19] **A.** How much he would pay me for a load.
[20] **Q.** How much he would pay you for a load.
[21] **A.** Yeah. To take a load from point A to point B.
[22] **Q.** How many trucks was your company -- I'll call
[23] it "running" at that time? How many trucks did it have
[24] working?
[25] **A.** Approximately 26, 27 tractors.

Page 28

[1] **A.** I don't know the relationship, but we were
[2] pulling for Jones Motor Group, not Tom Thompson Trucking.
[3] **Q.** Well, what was your understanding of the
[4] relationship between Tom Thompson Trucking and Jones
[5] Motor Group at the time that you-all first started
[6] pulling loads?
[7] **A.** At the time I didn't understand the
[8] relationship. What I understand was we're pulling load
[9] under -- the paperwork came under Jones Motor Group.
[10] **Q.** Did you ever come to an understanding of what
[11] that relationship was?
[12] **A.** With time, yes.
[13] **Q.** What was your understanding of that
[14] relationship that you came to with time?
[15] **A.** That Jones Motor Group were -- It was Tom
[16] Thompson was using Jones Motor Group -- their MC number,
[17] and basically Jones Motor Group were doing all the
[18] necessary stuff for Tom Thompson Trucking other than
[19] dispatching. They were doing everything else.
[20] **Q.** Were they doing the administrative paperwork?
[21] Is that a fair way to put it?
[22] **A.** Yes.
[23] **Q.** And Tom's company was doing the dispatching and
[24] getting the loads to pull?
[25] **A.** Yes.

Page 29

[1]    Q.  In the fall of 2007, before that -- let's say
[2]  before October 12, how many times do you think that you
[3]  and Mr. Thompson met face to face?
[4]    A.  I don't know.
[5]    Q.  Well, do you have an estimate of how many
[6]  times?  Was it less than 10?
[7]    A.  I don't know.
[8]    Q.  Would it be more than 10?
[9]    A.  No.
[10]    Q.  Do you have an idea of how many times that you
[11]  and he talked over the phone?
[12]    A.  I don't know.
[13]    Q.  Would it be more than 10 or less than 10?
[14]    A.  I don't know.
[15]    Q.  Would it be more than a hundred or less than a
[16]  hundred?
[17]    A.  I don't know.
[18]    Q.  Would it be many times or a few times?
[19]    A.  I don't recall.
[20]    Q.  How long did your company use the services of
[21]  Mr. Thompson for obtaining new customers for pulling
[22]  loads?
[23]    A.  We didn't obtain the customers.  It was just
[24]  dispatching our trucks.
[25]    Q.  But the dispatching of your trucks allowed

Page 30

[1]  you-all to provide services that you billed for, correct?
[2]    A.  We didn't bill for them.  Jones Motor Group
[3]  billed for them.
[4]    Q.  How did your company get paid?
[5]    A.  From Jones Motor Group.
[6]    Q.  They were handling the administrative
[7]  paperwork, correct?
[8]    A.  Yes.
[9]    Q.  So there was a period of time, if I understand
[10]  it correctly, when your company, your trucking -- the
[11]  trucking part of your company, was using Mr. Thompson and
[12]  Jones Motor Group to increase its business.
[13]    A.  Yes.
[14]    Q.  Pull more loads because of the relationship.
[15]    A.  Yes.
[16]    Q.  Did that -- And I think that relationship with
[17]  Mr. Thompson's company changed.  But do you agree with me
[18]  that that relationship changed in October of 2007?
[19]    A.  Yes.
[20]    Q.  Did you sign an agreement that's dated October
[21]  12?  And I believe -- And I'll show it to you.  I
[22]  believe it's called an agreement for the purchase and
[23]  sale of business.  And let me get a copy for you.
[24]      (Exhibit No. 1 marked)
[25]      Mr. Kholi, I'm going to hand you what's

Page 31

[1]  been marked Exhibit 1.  I'll ask if you can identify that
[2]  document.
[3]    A.  This document, according to Mr. Tom -- It's
[4]  drawn by Mr. Tom Thompson, and it's supposed to be a
[5]  memorandum of understanding.
[6]    Q.  My question is:  Do you recognize that
[7]  document?
[8]    A.  Yes.
[9]    Q.  And I believe it consists of three pages, that
[10]  we've marked, Bates-stamped Thompson 10, 11 and 12.  Have
[11]  we got all three pages there?
[12]    A.  Yes.
[13]    Q.  Did you sign this agreement?
[14]    A.  Yes.
[15]    Q.  Now, on the back page there's a signature block
[16]  at the top right for Sam Kholi Enterprises, Inc., Buyer,
[17]  by, and printed is the name Sam Kholi, President.  Is
[18]  that your signature right above that -- the printed name
[19]  Sam Kholi, President?
[20]    A.  Yes.
[21]    Q.  And below that there is a -- there are two
[22]  paragraphs entitled Guaranty By Stockholders.  And
[23]  there's a signature block, Sam Kholi, President, Sam
[24]  Kholi Enterprises, Inc.  Is that your signature above
[25]  that -- those printed words?

Page 32

[1]    A.  I don't remember those two paragraphs.
[2]    Q.  Well, my question is:  Is that your
[3]  signature?
[4]    A.  I don't remember.
[5]    Q.  Well, do you think that somebody else signed
[6]  your name?
[7]    A.  I don't remember.
[8]    Q.  I'll ask you the same for --  The next
[9]  paragraph is entitled Guaranty, and below that paragraph
[10]  there's a signature block for Sam Kholi, Guarantor.  Is
[11]  that your signature?
[12]    A.  I don't think so.
[13]    Q.  What makes you think it's not your signature?
[14]    A.  Because this was a memorandum of understanding.
[15]    Q.  Because it was a memorandum of understanding,
[16]  it makes you think that somebody else signed your name
[17]  there?
[18]    A.  It's very possible.
[19]    Q.  Well, Mr. Kholi, my question is:  Do you
[20]  remember signing that -- your name right above the typed
[21]  words Sam Kholi, Guarantor?
[22]    A.  And I answered and said I don't remember.
[23]    Q.  You don't remember?  And you don't remember
[24]  signing -- you don't remember whether you did or not sign
[25]  it?  You don't remember if you signed it or not?

